JUDGE SANDRA CABRINA JENKINS
*22 Defendant, Pharaoh Brazell, appeals his conviction for second degree battery and his subsequent adjudication and sentence as a fourth felony offender. For the reasons discussed herein, we affirm defendant's conviction and multiple offender adjudication, but we vacate defendant's sentence and remand this case to the trial court for a hearing on defendant's motion for downward departure and for resentencing.[1]
STATEMENT OF THE CASE
On August 22, 2014, defendant was charged by grand jury indictment with (Count 1) attempted first degree murder, (Count 2) aggravated rape,[2] and (Count 3) second degree kidnapping of K.H.[3] At his arraignment on August 27, 2015, defendant pled not guilty to all charges. On January 5, 2016, the State amended Count 1 of the indictment from attempted first degree murder, a violation of La. R.S. 14:(29)30, to second degree battery, a violation of La. R.S. 14:34.1, and dismissed Count 3.
Following a three-day jury trial, on January 27, 2016, defendant was found guilty of second degree battery and not guilty of aggravated rape. Defendant filed motions for new trial and for post-verdict judgment of acquittal. On February 24, 2016, the trial court denied defendant's motions and sentenced defendant to five years at hard labor.[4] On that same date, the State filed a *23 multiple offender bill charging defendant as a fourth offender.
On May 19, 2016, the trial court held a multiple bill hearing. Following the presentation of evidence and arguments, the trial court denied defendant's motion to quash the multiple bill and adjudicated defendant a fourth offender. The trial court vacated defendant's original sentence for the second degree battery conviction and re-sentenced him to thirty-five years at hard labor. Following sentencing, defense counsel filed a motion for downward departure and requested an evidentiary hearing pursuant to State v. Dorthey , 623 So.2d 1276 (La. 1993). The trial court denied the request for a hearing but set a date for ruling on the motion for downward departure. The trial court also granted defendant's motion for appeal. Subsequently, on July 8, 2016, the trial court denied the defense motion for downward departure.
This timely appeal followed.
FACTS
K.H., the victim in this case, testified that she and defendant had been in a relationship for several years prior to the incident on July 13, 2014. K.H. stated that she and defendant were "very much in love" but "the relationship was very toxic." She also described defendant as an angry, volatile person, who had been violent with her in the past and had been arrested for domestic violence against her in 2012 and 2013. For several weeks prior to July 13, 2014, K.H. had been living at her daughter's house in Algiers and caring for a dying relative; during that time, K.H. had not seen or spoken to defendant.
On July 13, 2014, at approximately 4:00 p.m., defendant unexpectedly arrived at K.H.'s daughter's house and rang the doorbell several times. K.H. stepped outside to greet defendant. She testified that she was afraid to let him inside the house with her daughter and mother present, because she "didn't know what state of mind he was in." In order to get him away from the house, K.H. agreed to go with defendant to his house. Before leaving with defendant, K.H. went back inside the house to bathe and dress. When she came outside to go with him, she noticed defendant's demeanor had changed; he began berating her for not coming to see him.
K.H. and defendant travelled by bus and streetcar to his house in Mid-City. Upon exiting the streetcar, defendant became angry and threatening towards K.H. But, when they arrived at defendant's house, K.H. and defendant engaged in consensual sex. Afterwards, defendant left the house while K.H. lay down to rest on a mattress on the floor.
When defendant returned, he noticed empty cups on the floor and angrily accused K.H. of having other men at the house in his absence. K.H. attempted to stand up from the mattress, but defendant kicked her in her face; she fell backwards onto the floor and felt blood pouring from her mouth. Weak and dazed from the kick to her face, K.H. laid on her stomach to prevent defendant from hitting her in the face again. Defendant then flipped K.H. over on her back, stood over her, and repeatedly punched her in her stomach. As K.H. began to drift "in and out" of consciousness, defendant pulled off her clothes, grabbed her by the head, and forcibly pushed her head into his groin to have her perform oral sex upon him. In response, K.H. bit defendant on his inner thigh. Defendant then grabbed a large piece of plastic that was separating two rooms in the house, he laid the plastic out on the floor, and he grabbed a rope. Defendant ordered K.H. to put the rope around her neck and lay face down on the plastic. Fearing that defendant was going *24 to kill her, K.H. attempted to get up and move towards the door of the house; but defendant kicked her down and tied her legs with the rope. As K.H. laid there, defendant's demeanor changed again; he started "laughing like it's a joke."
Defendant then told K.H. that she should get to a hospital but that he could not take her. K.H. convinced defendant to take her to the hospital by promising to tell hospital staff and police that a stranger robbed and beat her. When he agreed to go with her, K.H. managed to get up and walk with defendant a few blocks to Broad Street, where he walked ahead of her to a gas station to call an ambulance. When defendant walked ahead, K.H. flagged down a police car pulling up to the gas station. K.H. told the police officer that defendant beat her up, that he had walked to the gas station to use the phone, and that he was going to say someone else beat her up. She explained to the officer that she told defendant she would lie to police about a stranger beating her so he would agree to bring her to the hospital. Soon after, an ambulance arrived to take K.H. to the hospital. K.H. did not remember much of what happened when she was taken to the hospital; but she knew she had surgery to remove her spleen.
Officer Joseph Betcher testified that, in the early morning hours of July 14, 2014, he responded to a domestic violence complaint reported by another officer at the city gas pump facility on Broad Street. When Ofc. Betcher arrived on the scene, K.H. was speaking with the reporting officer, Sergeant Shaw, and defendant was detained by other officers on scene. Ofc. Betcher activated his body camera before speaking with K.H., whom he observed to be badly, physically beaten, with injuries to her face, lips, and eyes. Ofc. Betcher took an initial statement from K.H., who stated that defendant was her ex-boyfriend and he had kicked and beat her. Ofc. Betcher attended to K.H. until the ambulance arrived and transported her to the hospital.
At that time, defendant was arrested on a charge of domestic abuse battery and placed in the back seat of Ofc. Betcher's patrol vehicle. While Ofc. Betcher filled out paperwork in his patrol vehicle, defendant made several statements that were recorded on Ofc. Betcher's body camera.[5] Defendant stated that he had dated K.H. in the past; and, earlier that night, she showed up at his house, told him that she was robbed and beaten, and needed defendant to bring her to the hospital. Defendant repeatedly denied hitting K.H. and said he did not know how she was injured. Defendant also made threatening statements, saying he would kill K.H. and Ofc. Betcher.
After transporting defendant to the First District Station, Ofc. Betcher relocated to Tulane Hospital, where K.H. was being treated for her injuries. Ofc. Betcher recorded a full statement from K.H. on his body camera. From her statement, Ofc. Betcher learned that defendant had repeatedly beat and kicked K.H., tied her up with a rope, strangled her, threatened to kill her, and forced her to have sex with him. Based on K.H.'s statement and injuries, Ofc. Betcher determined that the investigation should be turned over to the N.O.P.D. Sex Crimes Division.
Ofc. Betcher also testified that he was familiar with defendant and K.H. from a previous domestic violence complaint. In January 2013, Ofc. Betcher responded to a *25 call from the same victim. Ofc. Betcher learned that K.H. had locked defendant out of their apartment; as a result, defendant became violently angry and broke a window to try to get inside. Ofc. Betcher recalled defendant's demeanor as threatening and "crazy with anger" towards K.H. Ultimately, Ofc. Betcher arrested defendant for disturbing the peace, criminal trespass, and criminal damage to property.
Detective Stephanie Taillon testified that, on July 14, 2014, she was assigned to the Sex Crimes Division of the Special Victim Section of N.O.P.D. On that date, she was called to investigate a sexual assault. She met with Ofc. Betcher at Tulane Hospital; he provided her with an overview of the case and introduced her to K.H. At that time, Det. Taillon was unable to interview K.H. due to her traumatic condition. But, based on the statements made to Ofc. Betcher, Det. Taillon requested that K.H. be transferred to University Hospital for sexual assault nurse examiner ("SANE") services.[6]
In the following week, Det. Taillon made two attempts to visit K.H. in the hospital for an interview. On her first attempt, Det. Taillon learned K.H. was in the intensive care unit ("I.C.U."), recovering from surgery to remove her spleen, and was unable to complete an interview. Once K.H. was transferred out of I.C.U., on July 25, 2014, Det. Taillon conducted a full, recorded interview with K.H. and took photographs of her injuries. Based on that interview, Det. Taillon applied for a buccal swab search warrant for defendant and a search warrant for defendant's residence, located at 705 North Gayoso Street.
Det. Taillon identified and described photographs taken during the execution of the search warrant for defendant's house. Det. Taillon noted that the interior of the house was in a "deplorable condition," but that there was a mattress and other items inside the house indicating someone had been staying there. Det. Taillon found a large piece of industrial-type plastic, a rope, several cups, and a bundle of bloody napkins, all of which K.H. had described in her interview.
Regarding the execution of the buccal swab search warrant, Det. Taillon testified that she met with defendant at the Orleans Parish Prison, where he was in custody. Det. Taillon identified herself to defendant as the investigating detective in this case. She told defendant she had a search warrant to collect two buccal swabs from him, and she explained the procedure to him. As she was conducting the procedure, defendant made several unprompted statements to her. Det. Taillon testified that defendant asked about K.H.'s condition, he stated he was "sorry this had to happen" and "I did this because I love her," and he said he felt bad about hitting K.H. and kicking her a few times. Det. Taillon repeatedly advised defendant to stop speaking to her and reminded him of his right to remain silent; nonetheless, he talked throughout the procedure. Det. Taillon documented defendant's statements in her report. She testified that she did not have any audio or visual recording of defendant's statements, because recording devices are prohibited at Orleans Parish Prison.
Eileen Smith, a sexual assault nurse examiner ("SANE nurse") for University Hospital, testified that she conducted a sexual assault interview and examination of K.H. on July 14, 2014. Ms. Smith recorded notes of her interview and examination of K.H., and she compiled her findings in a report that was introduced into *26 evidence at trial. Ms. Smith documented and photographed the following injuries on K.H.: periorbital swelling and bruising to her right eye; swelling to both lips; internal lacerations on her bottom lip; horizontal marks on the proximal portion of her neck; bruising to her left elbow and forearm; and swelling to the proximal area of her left knee. Ms. Smith also performed a pelvic exam and collected swabs for the sexual assault forensic evidence kit.[7] Ms. Smith noted that K.H. was in a great deal of pain and trauma and, subsequently, underwent surgery to remove her spleen.
Dr. Peter Meade testified as an expert in critical care and as a member of the surgical team who treated K.H.'s injuries. Dr. Meade identified and reviewed K.H.'s medical records from her admission to the hospital on July 14, 2014. Dr. Meade listed nine discernible injuries to K.H., with the most severe being a grade 4 splenic laceration that required surgical intervention to remove her spleen, "to save her life." He also listed the injuries to her left elbow, left knee, thighs, lips, right eye, and neck. Dr. Meade stated that K.H.'s level of trauma was acute when she was admitted to the hospital. Further, he noted that "the injury to the spleen was life-threatening" and falls within the definition of serious bodily injury.
DISCUSSION
In this appeal, defendant raises eight assignments of error-two of which were raised in a counseled brief and six within his supplemental pro se brief. In his final, pro se assignment of error, defendant argues that the evidence presented at trial was insufficient to support his conviction for second degree battery. We address this assignment of error first, in accordance with our jurisprudence that "[w]hen issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." State v. Miner , 14-0939, p. 5 (La. App. 4 Cir. 3/11/15), 163 So.3d 132, 135 (quoting State v. Hearold , 603 So.2d 731, 734 (La. 1992) ).
Sufficiency of the Evidence
In evaluating whether the evidence is sufficient to support a conviction, this Court applies the standard of review set forth by the United States Supreme Court in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the Jackson standard, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could be convinced that all of the elements of the crime had been proven beyond a reasonable doubt. State v. Tate , 01-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928. In applying this standard, the reviewing court must consider the record as a whole, as the *27 rational trier of fact would do; and if rational triers of fact could disagree as to the interpretation of the evidence, then a rational trier's view of the evidence most favorable to the prosecution must be adopted. Miner , 14-0939, p. 6, 163 So.3d at 136 (quoting State v. Huckabay , 00-1082, p. 32 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111 ). The reviewing court is "not permitted to second guess the rational credibility determinations of the fact finder at trial." State v. Kelly , 15-0484, p. 3 (La. 6/29/16), 195 So.3d 449, 451 (citing State v. Marshall , 04-3139 (La. 11/29/06), 943 So.2d 362, 367 ). "It is not the function of an appellate court to assess credibility or reweigh the evidence." Id. (citing State v. Stowe , 635 So.2d 168, 171 (La. 1994). "The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." State v. Egana , 97-0318, p. 6 (La. App. 4 Cir. 12/3/97), 703 So.2d 223, 228 (citing State v. Mussall , 523 So.2d 1305 (La. 1988) ); see Jackson , 443 U.S. at 319, 99 S.Ct. 2781.
In this case, defendant argues that the State failed to establish beyond a reasonable doubt the essential elements of the offense of second degree battery, specifically that he intentionally inflicted serious bodily injury upon K.H. Second degree battery, a violation of La. R.S. 14:34.1, is defined as "a battery when the offender intentionally inflicts serious bodily injury." "Serious bodily injury" is further defined as "bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death." La. R.S. 14:34.1(B)(3).
At trial, K.H. testified that defendant repeatedly kicked and punched her in the face and body to an extent that she was drifting in and out of consciousness. She stated that she could barely move to defend herself or escape due to the injuries defendant had inflicted upon her. She also testified that she believed defendant "had to be plotting this" and intended to kill her, which is what she always feared during their volatile relationship.
Ofc. Betcher testified that K.H. appeared badly, physically beaten when he first spoke with her and that K.H. identified defendant as the person who beat her. In addition, the jury viewed Ofc. Betcher's body camera footage of K.H.'s statements to him-both on the scene and at the hospital. Moreover, the video footage and photographs of K.H. taken at the hospital, admitted into evidence at trial, depict the numerous physical injuries to K.H.'s face and body.
Det. Taillon testified that defendant made several unprompted, self-incriminating statements to her during the buccal swab search warrant procedure. When he learned that K.H. was still in the hospital, defendant told Det. Taillon that he "kicked [K.H.] a few times in the butt" and he "felt bad about hitting her."
Dr. Meade testified regarding the serious, life-threatening extent of K.H.'s injuries, most significantly the grade 4 splenic laceration that required surgical intervention "to save her life." Dr. Meade opined that the near-fatal injury to K.H.'s spleen could have been caused by a fall, kick, or a punch. Dr. Meade also discussed the continuing health effects and complications that K.H. may experience due to the removal of her spleen.
In sum, the testimony and evidence presented at trial included the victim's testimony that defendant repeatedly, intentionally beat and kicked her; medical testimony regarding the serious, life-threatening extent of the injuries inflicted *28 upon the victim; and video and photographic evidence of the victim's injuries. Based on the totality of the testimony and evidence presented at trial, viewed in the light most favorable to the prosecution, we find that any rational trier of fact could find that the elements of the offense of second degree battery had been proved beyond a reasonable doubt.
Sufficiency of Amended Indictment
In another pro se assignment of error, defendant argues that the trial court erred in allowing the State to amend Count 1 of the grand jury indictment from attempted first degree murder to second degree battery. Defendant argues that the amendment to the indictment violated his constitutional rights to be informed of the nature of the charges against him and to have his prosecution initiated by grand jury indictment.
"The time for testing the sufficiency of an indictment is before trial by way of a motion to quash or an application for a bill of particulars." State v. Reel , 10-1737, p. 9 (La. App. 4 Cir. 10/3/12), 126 So.3d 506, 514 (citing State v. Gainey , 376 So.2d 1240, 1243 (La. 1979) ). It is well-settled in Louisiana that "[a] post-verdict attack on the sufficiency of an indictment does not provide grounds for setting aside a conviction unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense." State v. Cavazos , 610 So.2d 127, 128 (La. 1992) ; see State v. Phillips , 10-0582, p. 10 (La. App. 4 Cir. 2/17/11), 61 So.3d 130, 137 ; State v. Page , 08-531, p. 16 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 452 ; State v. Johnson , 07-1040, p. 7 (La. App. 4 Cir. 9/10/08), 993 So.2d 326, 330.
The record reflects that defendant was initially indicted for attempted first degree murder of K.H. on August 22, 2014. On January 5, 2016, the date set for trial, the State amended that count of the indictment from attempted first degree murder to second degree battery of K.H., a lesser offense.[8] On that same date, the defense requested a continuance, which the trial court granted. On January 13, 2016, the defense filed a motion for bill of particulars, regarding the conduct alleged against defendant constituting the elements of second degree battery. On January 20, 2016, the State filed its response to the defense motion for bill of particulars. On January 25, 2016, defendant filed a motion to quash the indictment, which the trial court denied. That same day, a jury was impaneled and trial commenced.
In the motion to quash filed prior to the commencement of trial, defendant argued that the amended indictment should be quashed on the grounds that it was not indorsed "a true bill" and was not signed by the foreman of the grand jury. See La. C.Cr.P. art. 533(A)(5). In denying the motion to quash, the trial court found that the original indictment was signed by the foreman of the grand jury and the amendment down did not have to be indorsed by the grand jury.
Under Louisiana law,[9] prosecution for a capital offense or an offense punishable *29 by life imprisonment shall be instituted by indictment by the grand jury, and prosecution of other felony offenses shall be initiated by indictment or information. La. Const. Art. I, § 15 ; La. C.Cr.P. art. 382A. An indictment is a written accusation of crime made by a grand jury that must be concurred in by not less than nine grand jurors, indorsed a "true bill," and the indorsement must be signed by the foreman. La. C. Cr.P. art. 383.
After the initiation of prosecution, at any time prior to trial, the district attorney has complete authority to amend indictments, both as to form and substance. La. C.Cr.P. art. 487 ; Reel , 10-1737, p. 10, 126 So.3d at 514 (citing State v. Neslo , 433 So.2d 73 (La. 1983) ). Moreover, "[d]istrict attorneys are empowered to amend indictments to charge lesser offenses" without the necessity of returning to the grand jury for a formal indictment. State v. Seals , 09-1089, p. 90 (La. App. 5 Cir. 12/29/11), 83 So.3d 285, 351 (citing State v. Davis , 385 So.2d 193, 196 (La. 1980) ; State v. Edwards , 287 So.2d 518, 525 (La. 1973) ). The purpose of requiring the State to file an amendment to an indictment before trial is to provide defendant with adequate notice of the crime for which he is charged so he can properly prepare his defense. State v. Delandro , 01-2514, p. 7 (La. App. 1 Cir. 5/10/02), 818 So.2d 1011, 1017. "Where the defense can show prejudice as a result of the amendment, the court should grant a motion for a continuance." Reel , 10-1737, p. 10, 126 So.3d at 514. Where the indictment against defendant provides sufficient notice of the crime with which he is charged, a defendant suffers no prejudice. Delandro , 01-2514, p. 7, 818 So.2d at 1017.
In this case, defendant cannot show prejudice as a result of the amendment. The record reflects that the State provided adequate discovery to defendant on the original charges in the indictment; when the State amended the charge of attempted first degree murder to the lesser charge of second degree battery, the trial court granted defendant a continuance of the trial; and, prior to trial on the amended charge, the State responded to defendant's motion for bill of particulars relating to the charge of second degree battery. Based on the foregoing, we find that defendant received fair notice of the nature of the charges against him. Therefore, defendant's post-verdict challenge to the indictment does not provide grounds for reversal. This assignment of error is without merit.
Motion to Suppress
In his next pro se assignment of error, defendant argues that the trial court erred in denying his motion to suppress statements.
Prior to trial, defendant moved to suppress statements he made to Ofc. Betcher and Det. Taillon based on the failure of either officer to advise him of his constitutional rights pursuant to Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After hearing testimony from both officers and reviewing the body camera footage of the statements made to Ofc. Betcher, the trial court denied the motion to suppress. At trial, Ofc. Betcher and Det. Taillon testified regarding statements made by defendant; in addition, Ofc. Betcher's body camera footage *30 was introduced into evidence and viewed by the jury during trial. Defendant now argues that the trial court's admission of his statements to Ofc. Betcher and Det. Taillon violated his constitutional right against self-incrimination.
A defendant adversely affected may move to suppress any statement from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. C.Cr.P. art. 703(A). A trial court's ruling on a motion to suppress is entitled to great weight, considering the trial court's opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Robinson , 09-1269, p. 5 (La. App. 4 Cir. 5/12/10), 38 So.3d 1138, 1141 (citing State v. Mims , 98-2572, p. 3 (La. App. 4 Cir. 9/22/99), 752 So.2d 192, 193-94 ). In reviewing a trial court's ruling on a motion to suppress, an appellate court applies a clearly erroneous standard to findings of fact, but reviews the trial court's ultimate decision de novo . State v. Kinard , 16-0917, p. 6 (La. App. 4 Cir. 3/15/17), 214 So.3d 109, 113 (citing State v. Everett , 13-0322, p. 4 (La. App. 4 Cir. 3/26/14), 156 So.3d 705, 709 ).
In Miranda v. Arizona , the United States Supreme Court held that, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. at 1612. Among the procedural safeguards implemented by Miranda , the Court required that a suspect subject to custodial interrogation be advised of his right to remain silent, his right to consult with an attorney, and to have counsel present during questioning. Id. , 384 U.S. at 469-71, 86 S.Ct. at 1625-26. The Court also explained that, "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. , 384 U.S. at 444, 86 S.Ct. at 1612. Thus, the requirement to advise a suspect of Miranda rights only applies if (1) the suspect is in "custody" or significantly deprived of freedom; (2) there is an "interrogation;" and (3) the interrogation is conducted by a law enforcement officer or agent. State v. Bernard , 09-1178, p. 5 (La. 3/16/10), 31 So.3d 1025, 1029.
This Court further explained the conditions of "custody" and "interrogation" as follows:
A suspect is "in custody" when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint of freedom of movement of the degree associated with formal arrest. State v. Stewart , 13-0779, p. 10 (La. App. 4 Cir. 1/22/14), 133 So.3d 166 ; (citations omitted). Furthermore, courts have found that Miranda warnings are "not required when officers conduct preliminary, non-custodial, on-the-scene questioning to determine whether a crime has been committed, unless the accused is subjected to arrest or a significant restraint short of formal arrest." State v. Riley , 15-0309 (La. App. 4 Cir. 9/30/15) (unpub .) 2015 WL 5771996.
* * *
"Interrogation" under Miranda includes express questioning by law enforcement as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State in the Interest of S.L. , 11-883, p. 18 (La. App. 5 Cir. 4/24/12), 94 So.3d 822, 836.
*31 "Police officers are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as the statements do not result from police-initiated custodial interrogation or questioning 'reasonably likely to elicit an incriminating response.' " S.L. , 11-883 at p. 19, 94 So.3d at 836 (citing State v. Ross , 95-1798 (La. 3/8/96), 669 So.2d 384, 386 ).
State in the Interest of W.B. , 16-0642, pp. 12-13 (La. App. 4 Cir. 12/7/16), 206 So.3d 974, 982-83.
At the hearings on defendant's motion to suppress,[10] the trial court heard testimony from Ofc. Betcher and Det. Taillon regarding the statements made to each by defendant. At the January 8, 2015 suppression hearing, Ofc. Betcher testified that when he arrived at the scene of the incident, he spoke with the victim while Sgt. Shaw took defendant into custody and handcuffed him. Sgt. Shaw then turned custody of defendant over to Ofc. Betcher, who placed defendant in the rear of his patrol car. Ofc. Betcher testified he did not read or advise defendant of his Miranda rights and he did not know whether Sgt. Shaw had done so when placing defendant in custody. Ofc. Betcher also testified that he did not interrogate defendant. As Ofc. Betcher sat in the patrol car completing paperwork, defendant "kept uttering many statements about killing her, killing me;" all of these statements were recorded on Ofc. Betcher's body camera. Ofc. Betcher acknowledged that defendant was in custody at the time he made the statements.
At the December 5, 2014 suppression hearing, Det. Taillon testified that she executed the search warrant to obtain buccal swabs from defendant at Orleans Parish Prison. Det. Taillon identified herself to defendant as the investigating detective in this case and explained to him that she was there to execute the search warrant.[11] Det. Taillon testified that she did not question or interrogate defendant at any time during the procedure. However, defendant asked Det. Taillon about K.H.'s condition, to which Det. Taillon responded that K.H. was still in the hospital. At that point, defendant began making spontaneous statements; he admitted to kicking and hitting K.H. a few times but that he was "sorry I had to do this" and that he loved her. Det. Taillon testified that she repeatedly told defendant to be quiet; she reminded him that he has the right to remain silent and that he should exercise that right; and, she informed him that "everything you say is going in my report." On cross-examination, Det. Taillon admitted that she did not advise defendant of his Miranda rights but stated that she did not interrogate him and told him to stop talking.
Based on our review of the testimony and evidence,[12] we find that defendant's statements to Ofc. Betcher and Det. Taillon were not the product of custodial interrogation and, thus, not subject to the protections *32 of Miranda . Neither Ofc. Betcher nor Det. Taillon subjected defendant to direct questioning or any words or actions that the officers should have known were reasonably likely to elicit an incriminating response. See State v. Leger , 05-0011, p. 20 (La. 7/10/06), 936 So.2d 108, 128 (citing State v. Koon , 96-1208, p. 7 (La. 5/20/97), 704 So.2d 756, 762 ); see also State v. Flemming , 15-1167, pp. 5-8 (La. App. 3 Cir. 6/1/16), 194 So.3d 1195, 1199-1201. Defendant's unsolicited, spontaneous statements did not implicate Miranda . Therefore, we find no error in the trial court's denial of defendant's motion to suppress. This assignment of error is without merit.
Improper Closing Arguments
Next, defendant argues that the prosecutor made improper comments in his closing arguments that influenced the jury and contributed to the verdict, thereby depriving defendant of a fair trial.
The general rule concerning the scope of arguments at trial is that they "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." La. C.Cr.P. art. 774. In addressing the issue of prosecutorial misconduct during arguments, "Louisiana jurisprudence allows prosecutors wide latitude in choosing closing argument tactics." State v. Casey , 99-0023, p. 17 (La. 1/26/00), 775 So.2d 1022, 1036 ). "Further, the trial judge has broad discretion in controlling the scope of closing arguments." Casey , 99-0023, p. 17, 775 So.2d at 1036 (citing State v. Prestridge , 399 So.2d 564, 580 (La. 1981) ). Consequently, even if the prosecutor exceeds the scope of arguments as set forth in La. C.Cr.P. art. 774, a reviewing court "must be thoroughly convinced that the argument influenced the jury and contributed to the verdict before reversing a conviction based on misconduct during the closing arguments." Casey , 99-0023, p. 17, 775 So.2d at 1036 (citing State v. Martin , 93-0285, p. 18 (La. 10/17/94), 645 So.2d 190, 200 ).
Defendant herein cites two instances of improper and prejudicial comments by the prosecutor during closing arguments. First, defendant argues that the prosecutor improperly argued to the jury that the defense was using "smokescreens" and "distractions" and raising objections "to take your [jury] attention away from the truth." However, our review of the record reveals no contemporaneous objection by defendant when the prosecutor made these comments during closing arguments;[13] thus, we find that this alleged error has not been properly preserved for appellate review. See La. C.Cr.P. art. 841A ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence."); State v. Campbell , 06-0286, p. 67-68 (La. 5/21/08), 983 So.2d 810, 854 ; State v. Manning , 03-1982, pp. 74-75 (La. 10/19/04), 885 So.2d 1044, 1108.
In the second cited instance of alleged prosecutorial misconduct during arguments, defendant contends that the State improperly shifted the burden of proof. During the State's rebuttal argument, the prosecutor responded to the defense argument that Det. Taillon's investigation was "reckless, negligent, careless," based, in part, on the fact that she did not request DNA testing on the rope or bloody *33 napkins recovered at defendant's house. The prosecutor stated, "[l]adies and gentlemen, that rope and that napkin has been sitting downstairs in this building, in evidence, for a year and a half. You know who equally could have had that tested?" At that point, defense counsel objected on the ground of "burden shifting," and the trial court overruled the objection.[14]
Defendant argues that this comment improperly shifted the burden of proof onto the defendant and misled the jury to believe that defense counsel had the burden to conduct its own testing on the evidence to prove defendant's innocence. However, a review of the arguments reveals that the prosecutor's comment was permissible rebuttal argument to defense counsel's criticism of Det. Taillon's investigation. In consideration of defense counsel's argument that Det. Taillon was negligent for failing to submit the rope and bloody napkins for DNA testing, the prosecutor merely pointed out to the jury that the defendant had access to the physical evidence if he wanted to challenge the findings from the investigation.
Even assuming the prosecutor's comments exceeded the scope of proper closing or rebuttal argument, we are not convinced that the comments influenced the jury and contributed to the verdict. The jury heard testimony from the victim, K.H., and investigating officers, and viewed photographic evidence of K.H.'s injuries and the crime scene at defendant's house that corroborated details of K.H.'s testimony. In consideration of all the testimony and evidence presented, and giving credit to the good sense and fair-mindedness of the jurors who heard the evidence and arguments, it is unlikely that any of the objected-to remarks by the prosecutor contributed to the jury's verdict finding defendant guilty of second degree battery. See State v. Allen , 12-1757, p. 13, (La. App. 4 Cir. 10/09/13), 126 So.3d 675, 684 (citing State v. Robinson , 01-1305, p. 14 (La. App. 4 Cir. 4/17/02), 820 So.2d 571, 580 ).
This assignment of error is without merit.
Multiple Bill Hearing
Defendant raises three pro se assignments of error related to his multiple offender proceeding. We address these assignments of error together.
First, defendant argues that the trial court erred in using a constitutionally invalid guilty plea as a sentence-enhancing predicate offense. Defendant asserts that his 2005 guilty plea in the State of Florida cannot serve as a sentence-enhancing predicate offense because the State failed to prove that, when entering the guilty plea, defendant was properly advised of and knowingly and intelligently waived his constitutional rights, pursuant to Boykin v. Alabama , 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
In order to establish a defendant's status as a multiple offender, pursuant to La. R.S. 15:529.1(D)(1)(b), the district attorney has the burden of proving beyond a reasonable doubt any issue of fact and the presumption of regularity of judgment shall be sufficient to meet the original burden of proof. See *34 State v. Lomax , 11-0591, p. 3 (La. App. 4 Cir. 11/28/11), 81 So.3d 788, 791. In Lomax , this Court explained the procedure by which the State can establish defendant's habitual offender status, as follows:
The State must establish the prior felony and prove that the defendant was the same person convicted of that felony. State v. Neville , 96-0137 (La. App. 4 Cir. 5/21/97), 695 So.2d 534, 538-39. Proof of identity can be established through a number of ways, including expert testimony matching the fingerprints of the accused with those in the record of the prior proceeding. State v. Isaac , 98-0182 (La. App. 4 Cir. 11/17/99), 762 So.2d 25, 28-29. It is sufficient to match fingerprints on an arrest register to a defendant, and then match the arrest register to a bill of information and other documents evidencing conviction and sentence; this can be done through a date of birth, social security number, bureau of identification number, case number, specifics and details of the offense charged, etc. See State v. Payton , 2000-2899 (La. 3/15/02), 810 So.2d 1127 ; State v. Anderson , 99-1407 (La. App. 4 Cir. 1/26/00), 753 So.2d 321.
11-0591, pp. 3-4, 81 So.3d at 791.
Where, as in this case, the prior conviction resulted from a guilty plea, the State must show that the defendant was advised of his constitutional rights, and that he knowingly waived those rights prior to pleading guilty, as required by Boykin . State v. Stanfield , 13-1193, p. 13 (La. App. 4 Cir. 3/26/14), 137 So.3d 788, 797. In Stanfield , this Court summarized the scheme adopted by the Louisiana Supreme Court for allocating burdens of proof in habitual offender proceedings as follows:
If the defendant denies the multiple offender allegations then the burden is on the State to prove (1) the existence of a prior guilty plea, and (2) that defendant was represented by counsel when the plea was taken. Once the State proves those two things, the burden then shifts to the defendant to produce affirmative evidence showing (1) an infringement of his rights, or (2) a procedural irregularity in the taking of the plea. Only if the defendant meets that burden of proof does the burden shift back to the State to prove the constitutionality of the guilty plea. In doing so, the State must produce either a 'perfect' transcript of the Boykin colloquy between the defendant and the judge or any combination of (1) a guilty plea form, (2) a minute entry, or (3) an "imperfect" transcript. If anything less than a "perfect" transcript is presented, the trial court must weigh the evidence submitted by the defendant and the State to determine whether the State met its burden of proof that defendant's prior guilty plea was informed and voluntary.
13-1193, p. 14, 137 So.3d at 797 (quoting State v. Causey , 10-1466, p. 4 (La. App. 4 Cir. 6/16/11), 67 So.3d 697, 701 ).
At the multiple bill hearing held on May 19, 2016, the State offered the testimony of expert latent fingerprint examiner Officer Joseph Pollard.[15] Ofc. Pollard testified that, prior to the hearing that day, he fingerprinted defendant in court; he identified the fingerprints he took from defendant as State's exhibit 1. The State subsequently offered and introduced the *35 certified packet from the State of Florida for defendant's 2005 conviction for possession of a controlled substance (to wit: morphine). The packet contained certified copies of the following documents: charging affidavit; an arrest warrant affidavit; fingerprint card; and court minutes/order and judgment reflecting his guilty plea on March 10, 2005.[16] Ofc. Pollard testified that he examined the fingerprints contained in the 2005 conviction packet, he compared them to the fingerprints he took from defendant prior to the hearing, and he concluded that all of the fingerprints examined came from the same individual.
In further support of the 2005 conviction, the State introduced the guilty plea form, dated March 10, 2005, and signed by defendant, his attorney, and the judge, in which defendant acknowledged and agreed to the following: he understood that he was waiving his rights to a trial by jury, to confront his accusers, to testify or to remain silent, and to appeal; he understood the charges to which he was pleading guilty; he understood the elements of the crime, possible defenses thereto, and maximum penalties; he was pleading because he was in fact guilty of the crime; and he was not pressured or promised anything to enter the plea. Finally, defendant attested that he read every word in the plea, discussed it with his attorney, and fully understood his plea of guilty.
Based on the evidence and testimony presented at the multiple bill hearing, we find the State met the requisite burden to prove that defendant knowingly and voluntarily entered a guilty plea on March 10, 2005, to a felony charge of possession of controlled substances, in the State of Florida. Thus, we find no merit in defendant's argument that the trial court erred in using an invalid guilty plea as a sentence-enhancing predicate.
Next, defendant argues that his defense counsel was ineffective during the multiple bill proceedings for failing to adequately pursue a mitigating investigation of the predicate offenses to challenge any infringement of his rights or procedural irregularity in the taking of his 2010 guilty plea in Jefferson Parish and 2011 guilty plea in Orleans Parish.
Generally, claims of ineffective assistance of counsel are more properly addressed in an application for post-conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Laneheart , 12-1580, p. 9 (La. App. 4 Cir. 2/26/14), 135 So.3d 1221, 1229 (citing State v. Howard , 98-0064, p. 15 (La. 4/23/99), 751 So.2d 783, 802 ). However, "an evidentiary hearing is not necessary where the record on appeal is sufficient to permit a determination of counsel's effectiveness at trial." State v. McGee , 98-1508, p. 4 (La. App. 4 Cir. 3/15/00), 758 So.2d 338, 341 (citing State v. Seiss , 428 So.2d 444 (La. 1983) ).
To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was deficient and (2) defendant was prejudiced by the deficiency. Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed. 2d 674 (1984). Counsel's performance is considered ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to defendant by the Sixth Amendment.
*36 Strickland , 466 U.S. at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced defendant if the errors were so serious as to deprive defendant of a fair trial. Id. To carry this burden, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland , 466 U.S. at 693, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. This Court has recognized that a defendant must make both showings to establish that counsel was so ineffective as to require reversal. State v. Jenkins , 09-1551, pp. 4-5 (La. App. 4 Cir. 6/30/10), 45 So.3d 173, 176 (citing State v. Sparrow , 612 So.2d 191, 199 (La. App. 4th Cir. 1992).
Here, defendant asserts that his defense counsel's performance was deficient for failing to file a motion for production of the Boykin transcripts from two of the predicate offenses used to enhance his sentence. He contends that the transcripts of his November 5, 2010 guilty plea in Jefferson Parish and his August 30, 2011 guilty plea in Orleans Parish would reveal an infringement of his rights or a procedural irregularity in the taking of the guilty pleas; thus, he contends that neither guilty plea was valid and could not be used to enhance his sentence.
The record of the multiple bill proceeding reflects that, pursuant to Shelton , supra , the State met its initial burden to show the existence of each guilty plea and that defendant was represented by counsel when each plea was taken. See Causey , 10-1466, p. 4, 67 So.3d at 701. For both the 2010 guilty plea in Jefferson Parish and the 2011 guilty plea in Orleans Parish, the State introduced certified copies of the bills of information, fingerprint cards, court minutes/docket master, and the guilty plea forms from each case. Each guilty plea form, signed by defendant, his counsel, and the judge, fully outlines the rights defendant was waiving by pleading guilty, including his Boykin rights.[17] Defendant acknowledges in each guilty plea form that his counsel explained the elements of the offense to which he was pleading guilty; that he understood the charges against him, possible defenses thereto, and the maximum penalties; that he was satisfied with the representation by counsel; and that he was pleading because he was in fact guilty of the crime. Finally, each guilty plea form indicates that defendant entered the plea knowingly, intelligently, and voluntarily.
After the State met that initial burden, the burden of proof shifted to defendant to produce affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the pleas. See Causey , 10-1466, p. 4, 67 So.3d at 701. The record of the multiple bill proceeding does not reflect that defendant argued or produced any evidence that either the 2010 or 2011 guilty plea was entered without an informed waiver of Boykin rights. In addition, although defendant *37 argues that defense counsel was deficient for not seeking to obtain a "perfect" transcript of the taking of each plea, defendant does not specify or establish what, if any, irregularity or infringement of rights that a transcript of either guilty plea would reveal. Thus, defendant fails to establish an ineffective assistance of counsel claim based on defense counsel's failure to obtain the Boykin transcripts of his guilty pleas. This assignment of error is without merit.
Finally, defendant argues that he was denied due process in his multiple offender proceeding, by being deprived of his right to a trial by jury and proof beyond a reasonable doubt of all elements necessary to enhance his sentence. Defendant asserts that United States Supreme Court jurisprudence, specifically Apprendi v. New Jersey , 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and Shepard v. U.S. , 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), holds that only the existence of a prior conviction need not be determined by a jury, but any other facts or elements that increase the penalty beyond the statutory maximum for an offense must be submitted to a jury.
This Court has previously rejected this argument that a defendant is entitled to a jury trial in a multiple offender proceeding. State v. Tatten , 12-0443, p.p. 4-5 (La. App. 4 Cir. 5/1/13), 116 So.3d 843, 846-47 ; State v. Smith , 07-1432, p. 4 (La. App. 4 Cir. 7/2/08), 989 So.2d 816, 818-19 ; State v. Dozier , 06-0621, pp. 3-5 (La. App. 4 Cir. 12/20/06), 949 So.2d 502, 504 ; State v. Smith , 05-0375, pp. 3-5 (La. App. 4 Cir. 7/20/05), 913 So.2d 836, 839-40. After review of the relevant United States Supreme Court jurisprudence, including the cases cited by defendant, "[t]his Court has determined that no constitutional right to a jury trial exists in multiple bill proceedings because all of the elements necessary to enhance the sentence 'can be determined by reviewing the documents submitted in support of the multiple bill of information.' " State v. Hackett , 13-0178, p. 11 (La. App. 4 Cir. 8/21/13), 122 So.3d 1164, 1172 (quoting State v. Vincent , 10-0764, pp. 10-11 (La. App. 4 Cir. 1/19/11), 56 So.3d 408, 415 ). Defendant cites no new jurisprudence from the Louisiana Supreme Court or the United States Supreme Court that casts doubt on this Court's determination of this issue. See State v. Landfair , 10-1693, p. 6 (La. App. 4 Cir. 7/20/11), 70 So.3d 1061, 1066. Thus, this argument is without merit.
Excessive Sentence and Motion for Downward Departure
In the final counseled assignment of error, defendant argues that his thirty-five year sentence for second degree battery as a fourth offender is excessive under the circumstances. In addition, defendant argues that the trial court erred in refusing to hold an evidentiary hearing on the defense motion for downward departure from the statutory minimum sentence.
Article I, § 20 of the Louisiana Constitution explicitly prohibits excessive punishment. Although a sentence is within statutory limits, the sentence may still be reviewed for constitutional excessiveness. State v. Every , 09-0721, p. 7 (La. App. 4 Cir. 3/24/10), 35 So.3d 410, 417 (citing State v. Smith , 01-2574, p. 7 (La. 1/14/03), 839 So.2d 1, 4 ). A constitutionally excessive sentence is one that makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly disproportionate to the severity of the crime. State v. Ladd , 15-0772 (La. 4/13/16), 192 So.3d 235, 240 ; State v. Dorthey , 623 So.2d 1276, 1280 (La. 1993).
*38 Mandatory minimum sentences imposed on multiple offenders under the Habitual Offender Law are presumed to be constitutional, and the Legislature's determination of an appropriate minimum sentence should be afforded great deference by the judiciary. State v. Hall , 14-1046, p. 15 (La. App. 4 Cir. 5/13/15), 172 So.3d 61, 70 ; State v. Johnson , 97-1906 (La. 3/4/98), 709 So.2d 672, 675. Accordingly, to rebut the presumption that a mandatory minimum sentence is constitutional, a defendant has the burden to clearly and convincingly show that "[he] is exceptional, which in this context means that because of unusual circumstances, the defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." Ladd , 15-0772, p. 10, 192 So.3d at 241 (quoting Johnson , 97-1906, 709 So.2d at 676 ). "Mere argument-unsupported by factual evidence-that a sentence is excessive is insufficient to carry the burden of proof." State v. Pernell , 14-0678, p. 5 (La. App. 4 Cir. 10/15/14), 151 So.3d 940, 944 (quoting State v. Conner , 09-1023, p. 5 (La. App. 4 Cir. 2/3/10), 30 So.3d 1132, 1135 ).
In reviewing a sentence for excessiveness, the appellate court must first determine whether the trial court adequately complied with the statutory sentencing guidelines set forth in La. C.Cr.P. art. 894.1, and whether the sentence is warranted in light of the particular circumstances of the case. State v. Dowell , 16-0371, pp. 10-11 (La. App. 4 Cir. 8/10/16), 198 So.3d 243, 249 ; State v. Ellis , 14-1170, p. 25 (La. App. 4 Cir. 3/2/16), 190 So.3d 354, 370-71. Pursuant to La. C.Cr.P. art. 894.1(C), the sentencing court "shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence." The relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. Every , 09-0721, p. 8, 35 So.3d at 417 (quoting Smith , 01-2574, p. 7, 839 So.2d at 4 ). A reviewing court may not set a sentence aside absent a manifest abuse of discretion. Id.
The record before us reflects that at defendant's original sentencing hearing, on February 24, 2016, the trial court heard victim impact testimony from K.H. Thereafter, the trial court imposed a sentence of five years at hard labor, which was the maximum sentence under La. R.S. 14:34.1, at the time the offense was committed in 2014. Following sentencing, defense counsel filed a motion to reconsider sentence; the trial court denied the motion in open court without any stated reasons. The State then filed the multiple bill charging defendant as a fourth offender.
At the conclusion of the multiple bill hearing, on May 19, 2016, the trial court stated that the State had proven defendant's status as a fourth offender under La. R.S. 15:529.1 based on his three predicate convictions. The trial court then promptly vacated defendant's original sentence and re-sentenced him to 35 years at hard labor as a fourth offender, without articulating any considerations or factual basis for the sentence imposed. Defense counsel noted its objection to the sentence and filed into the record a motion for downward departure from the statutory minimum sentence, for which defense counsel requested an evidentiary hearing pursuant to Dorthey . The following colloquy occurred between defense counsel and the trial court:
Defense Counsel:
And, Your Honor, we'd ask that it be set for a Dorothy (sic) hearing and for-provide *39 an evidentiary hearing as regarding to Dorothy (sic). Also ask, just for the record-
Judge:
I don't think you're really entitled to a Dorothy (sic) hearing. You can submit a memorandum and I'll review it. But I don't have to set it for a Dorothy (sic) hearing. I've just done the multiple bill and sentenced [the defendant]. I don't know that you're entitled to a Dorothy (sic) Hearing. You can file a motion asking for the court to consider resentencing him pursuant to Dorothy (sic). But I'm not setting it for a hearing.
Defense Counsel:
We'll file a motion both for an evidentiary hearing and for-ask the court for a downward departure, Your Honor.
Judge:
But you're not entitled to a hearing on it, [counsel]. So if you want to file the motion, I will file it and review-I mean I'll review your motion and rule on it.
* * *
Defense Counsel:
And we'd ask that the court consider a ruling date on August 3rd on his Dorothy (sic) Motion at that point or evidentiary hearing and ruling on that date.
Court:
Well, I'm not granting an evidentiary hearing. Because I doubt if I'm granting a Dorothy (sic) Motion. So you don't get the hearing. I keep saying the same thing. I'm not sure what part of it you don't understand.
Defense Counsel:
No. I understand the court's position. Our position is we-we're asking the court for the hearing.
Court:
I'll deny your motion as to that. But if you want me to rule on your motion, I-
* * *
Defense Counsel:
Well, judge, we would ask that the court reconsider the sentence.
On July 8, 2016, the date set for a ruling on defendant's motion for downward departure, defense counsel filed a motion for continuance of the Dorthey hearing, requesting time and resources to investigate and present mitigating evidence. The trial court denied the motion for continuance as moot, based on its previous denial of defense counsel's request for an evidentiary hearing. The trial court then heard arguments on defendant's motion for downward departure, which the trial court denied.
Defendant now argues that the trial court erred in refusing to allow the defense to present evidence to support its motion for downward departure. Based on the record before us and in light of this Court's recent, relevant jurisprudence, we agree. While we recognize that the sentence imposed on defendant is well within the statutory range under the applicable provision of La. R.S. 15:529.1, which mandates a sentence of not less than twenty years and not more than life imprisonment, we find that this record is insufficient to allow for a meaningful review of defendant's excessiveness claim.
Recently, in State v. Dowell , supra , this Court remanded to the trial court for resentencing upon finding that the record was insufficient to review defendant's excessiveness claim as to her thirty-year sentence as a fourth offender. This Court reasoned as follows:
Here, the trial court articulated no reasons for its denial of Ms. Dowell's motion for a downward departure from the minimum sentence or the considerations taken into account for imposing the thirty-year sentence. As we found in State v. Ellis , 14-1170, pp. 3, 37 (La. App. 4 Cir. 3/2/16), 190 So.3d 354, 357, 358, writ *40 denied , 16-0618 (La. 5/13/16), 191 So.3d 1057, we find that the trial court "failed to hold a full and meaningful hearing on Defendant's motion for downward departure" and that the record in this matter "is simply too insufficiently developed" for the trial court "to have properly determined that" a downward departure in Ms. Dowell's case was not warranted.
Dowell , 16-0371, p. 11, 198 So.3d at 249-50. Similarly, in State v. Ladd , supra , this Court found it could not determine whether defendant's seventeen-year sentence as a third offender was excessive based on the failure of the trial court either to order a presentence investigation (PSI) or to give the defendant a meaningful "opportunity to present any mitigating factors to substantiate his claim is an exceptional case in which a downward departure from the statutory minimum sentence is appropriate." 15-0772, p. 14, 192 So.3d at 243. Accordingly, we remanded for an evidentiary hearing and resentencing "after properly considering whether a downward departure from the statutory minimum is warranted." Ladd , 15-0772, p. 17, 192 So.3d at 245.
In State v. Pernell , supra , this Court remanded the case for a second resentencing upon finding that the trial court had failed to comply with its remand instructions issued in the first appeal. At the defendant's original sentencing, the trial court imposed a legislatively-mandated life sentence for second degree murder, but the trial court failed to rule on defendant's motion to reconsider sentence. In remanding the case in the first appeal, the trial court was ordered "to explicitly determine whether the defendant's situation is one of those rare and exceptional circumstances that would justify a downward departure from the legislatively mandated and presumptively constitutional sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence." Pernell , 14-0678, p. 6, 151 So.3d at 940 (quoting State v. Pernell , 13-0180 (La. App. 4 Cir. 10/2/13), 127 So.3d 18, 30 ). But, "[r]ather than permitting Mr. Pernell to rebut this presumption by introducing evidence and adducing testimony" the trial court summarily denied the motion to reconsider. Id . In remanding the case again with explicit instructions to conduct an evidentiary hearing on defendant's motion to reconsider sentence, the Court reasoned as follows:
"The importance of a full evidentiary hearing in the district court on a claim of excessiveness can hardly be overstated." Conner , 09-1023, p. 5, 30 So.3d at 1135 n. 4. "The only opportunity for review of the sentencing decision is on direct appeal as there is no post-conviction review available on such claim." Id. (citing State ex rel. Melinie v. State , 93-1380 (La. 1/12/96), 665 So.2d 1172 (per curiam ) ). "Moreover, ... there is no post-conviction review available for ineffective assistance of counsel at sentencing claims." Id. (citing State v. Thomas , 08-2912 (La. 10/16/09), 19 So.3d 466 ). Thus, as all other avenues of review are unavailable, a sentencing judge should permit a defendant to introduce evidence and substantiate his claim at the hearing on the motion, because, in the absence of evidence, there is nothing for this Court to review of appeal. See id. , 09-1023, p. 5, 30 So.3d at 1135 (citing State v. Allen , 09-0813, p. 6 (La. App. 4 Cir. 1/13/10), 30 So.3d 1024, 1027 ).
Pernell , 14-0678, pp. 5-6, 151 So.3d at 945.
In the instant case, the trial court failed to state for the record any reasons or considerations in sentencing defendant to thirty-five years as a fourth offender. Then, after being denied the opportunity to present evidence in support of a downward *41 departure, defense counsel argued that the sentence imposed was seven times the maximum sentence for the second degree battery conviction in this case and that, given defendant's age of 40 years old, the sentence was the functional equivalent of a life sentence. In denying defendant's motion for downward departure, the trial court noted only that the sentence imposed was within the statutory range for a fourth offender and the victim in this case suffered extreme injury. Based on this record, particularly in the absence of any reasons or considerations for the sentence imposed or the denial of the motion for downward departure, we cannot adequately review defendant's claim of excessiveness. Further, in light of this Court's recent jurisprudence, we find that the trial court erred in denying defendant's motion for downward departure without allowing him an opportunity to present evidence and adduce testimony to rebut the presumption of constitutionality and to substantiate his claim of being an exceptional case in which a downward departure is appropriate.
Accordingly, we vacate defendant's thirty-five year sentence as a fourth offender and we remand to the trial court for a meaningful sentencing hearing at which defendant shall be afforded the opportunity to present mitigating evidence and testimony in support of his motion for downward departure from the statutory minimum. After properly considering whether a downward departure from the statutory minimum is warranted in this case, in light of applicable jurisprudence, the trial court is instructed to state for the record the considerations for its ruling on the motion and for the sentence imposed.
CONCLUSION
For the reasons stated herein, we affirm defendant's conviction for second degree battery and his adjudication as a fourth offender. We also vacate defendant's sentence and remand this case for a meaningful, evidentiary hearing on defendant's motion for downward departure from the statutory minimum and for resentencing.
AFFIRMED IN PART, VACATED IN PART, AND REMANDED
BARTHOLOMEW-WOODS, J., CONCURS IN THE RESULT

Our review for errors patent on the face of the record reveals one. In sentencing defendant as a fourth offender, the trial court failed to stipulate that the sentence be served without the benefit of probation or suspension of sentence in accordance with La. R.S. 15:529.1(G). However, based on our decision to vacate defendant's sentence and remand for resentencing, we need not take any action to correct such error. Moreover, La. R.S. 15:301.1(A) provides, in pertinent part, that "[t]he failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement" that those restrictions apply. Our jurisprudence recognizes that "this paragraph self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute." State v. Williams , 00-1725, p. 10 (La. 11/28/01), 800 So.2d 790, 799 ; State v. Dowell , 16-0371, pp. 4-5 (La. App. 4 Cir. 8/10/16), 198 So.3d 243, 246.
We also note, in accordance with State v. Kisack , 16-0797 (La. 10/18/17), 236 So.3d 1201, our errors patent review indicates that the State met its burden of proving the ten year cleansing period under La. R.S. 15:529.1(C) had not elapsed between the expiration of sentences for the predicates offenses and the commission of the present offense.

In 2015, the Louisiana Legislature amended La. R.S. 14:42 to rename the offense of aggravated rape to first degree rape. 2015 La. Acts No. 256, § 1.

In order to protect the identity of the victim of a sex offense and in accordance with La. R.S. 46:1844(W), the initials of the victim will be used in this opinion.

After the trial court denied defendant's motions, defendant expressly waived the sentencing delay provided for in La. C.Cr.P. art. 873.

Ofc. Betcher's body camera footage was introduced into evidence and viewed by the jury.

Det. Taillon testified that Tulane Hospital did not provide sexual assault examinations, which must be conducted by a certified sexual assault nurse examiner ("SANE").

Julia Kirk, a forensic DNA Analyst with the Louisiana State Police Crime Lab, testified regarding the DNA testing of the evidence collected in this case. Ms. Kirk explained the process of initial testing-to determine if there is blood or semen present-and of extracting DNA from the swabs collected from K.H. and from defendant. Several of the swabs collected from K.H. for the sexual assault kit tested positive for semen, from which two DNA profiles were identified. Based on her comparison to the DNA profiles developed from K.H. and the defendant, Ms. Kirk determined that defendant could not be excluded as a contributor of the semen. Through further statistical analysis, called a random match probability, Ms. Kirk determined that the probability that any other random individual other than defendant was the contributor to the semen would be "approximately one in seven hundred and seven quintillion in the Caucasian population; one in forty-five point six quintillion in the black population and eight hundred and sixty-two quintillion in the Southwest Hispanic population."

Attempted first degree murder, a violation of La. R.S. 14:(27)30, is punishable by imprisonment at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence. See La. R.S. 14:27D(1)(a). At the time of the commission of the offense, second degree battery, a violation of La. R.S. 14:34.1, was punishable by a fine of not more than two thousand dollars or imprisonment, with or without hard labor, for not more than five years.

The provision of the Fifth Amendment to the United States Constitution requiring prosecution "for capital, or otherwise infamous crime" to be instituted only by a grand jury indictment applies only to federal prosecutions and is not binding on the states. Alexander v. Louisiana , 405 U.S. 625, 636, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (citing Hurtado v. California , 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed.2d 232 (1884) ); State v. Young , 249 La. 609, 612, 188 So.2d 421, 422 (1966) ("[I]t is not a violation of the Federal Constitution for a State to provide for prosecution of an infamous crime by information when the constitution of the State authorizes that procedure.) (collecting cases).

The hearing on defendant's motion to suppress commenced on December 5, 2014. Following testimony from Det. Taillon, the trial court held the matter open and set another date to allow defense counsel to serve Ofc. Betcher. On January 8, 2015, Ofc. Betcher testified and the trial court took the matter under advisement. On January 30, 2015, the trial court ruled on defendant's motion to suppress in open court.

Det. Taillon also stated that she was attired in her "police Class B summertime uniform" when she executed the search warrant for the buccal swabs.

We reviewed Ofc. Betcher's body camera video and find his testimony regarding defendant's statements are consistent with the video footage of his interactions with defendant on scene and during transport.

The requirement of a contemporaneous objection has two purposes: (1) to put the trial court on notice of an alleged irregularity at a time when the trial court may correct the error; and (2) to prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might have been corrected at trial. State v. Ruiz , 06-1755, p. 8 (La. 4/11/07), 955 So.2d 81, 87 (citing State v. Arvie , 505 So.2d 44, 47 (La. 1987) ).

Following the ruling on the objection, the prosecutor continued as follows:
Defense could have just said: hey, judge, I'm gonna file a motion to send this stuff off to the lab. You think they wanted that done? Huh? Said, well, Detective Taillon doesn't do it so she's a terrible detective. The state doesn't want that done. All they had to do was ask to do it. I don't think they wanted that done.
Defense counsel did not contemporaneously object to this further comment.

Ofc. Pollard testified that he has been employed by the N.O.P.D. for more than 25 years, and assigned to the latent print unit of the criminal records division for 12 years. He further testified to his training and education in the examination of latent prints, and he stated that he had been qualified as an expert in the field of latent print examination in every section of Criminal District Court.

In addition, the certified packet contained the following: court minutes/order from the hearing on defendant's violation of probation; conditions of probation; a fugitive arrest warrant; writ of attachment; and documents confirming defendant's identity through his name, race, gender, and date of birth.

In addition, the minute entry on November 5, 2010, for case no. 09-1422 from Jefferson Parish, indicates that defendant was present in court and represented by counsel, the trial court advised defendant of his Boykin rights, defendant waived his rights, and defendant pled guilty. For the August 30, 2011 guilty plea in case no. 506-993 from Orleans Parish, the docket master indicates that defendant was present in court and represented by counsel when he entered his guilty plea, but it does not list the rights to which the trial court advised defendant prior to taking his plea; but, as stated above, the guilty plea form fully outlines all of the rights defendant was advised of, understood, and waived prior to entering his guilty plea. See State v. Dozier , 06-0621, pp. 8-9 (La. App. 4 Cir. 12/20/06), 949 So.2d 502, 507.