STEPHENS, J.
This criminal appeal arises from the Second Judicial District Court, Parish of Bienville, State of Louisiana. The defendant, Lynn Tony Clark, Jr., was convicted of principal to armed robbery with a firearm in violation of La. R.S. 14:24 and 14:64.3, and principal to aggravated second degree battery, in violation of La. R.S. 14:24 and 14:34.7. Clark was sentenced to 20 years at hard labor on the conviction for armed robbery and 10 years at hard labor on the conviction for aggravated second degree battery, to run concurrently. Clark was subsequently adjudicated a habitual offender, but his original sentence was not vacated. For the following reasons, Clark's conviction is affirmed, his habitual offender sentence is vacated, and the matter is remanded for resentencing.
FACTS AND PROCEDURAL HISTORY
On April 21, 2016, LaDarrius Coleman was the victim of a robbery and sustained a gunshot wound to the head. Coleman survived his injuries and positively identified individuals involved in his attack. Coleman did not name Lynn Tony Clark, Jr. as someone who participated in the crime, nor was he able identify Clark in a photo lineup. Following an investigation by the Bienville Parish Sheriff's Office, Clark was arrested and charged by amended bill of information with principal to armed robbery with a firearm in violation of *1182 La. R.S. 14:24 and 14:64.3, and principal to aggravated second degree battery, in violation of La. R.S. 14:24 and 14:34.7.
Prior to trial, Clark moved to have Coleman sequestered because of the likelihood that his testimony and identification of Clark would be influenced by the testimony of other witnesses. The trial court ruled that under the exceptions to La. C. E. art. 615(B)(4), Coleman had a right to remain in the courtroom and was not subject to the sequestration order. A jury trial commenced where Coleman testified along with 13 other witnesses. Clark was found guilty as charged on both counts. A motion for new trial, re-urging Clark's objection to Coleman's presence in the courtroom for the entirety of the trial, was denied. Clark subsequently was sentenced to 20 years at hard labor on the conviction for armed robbery and 10 years at hard labor on the conviction for aggravated second degree battery, to run concurrently. Clark's motion to reconsider sentence was denied.
Following Clark's conviction, the state filed a habitual offender bill of information, a contradictory hearing was held, and Clark was adjudicated a habitual offender. The trial court declined to vacate Clark's prior sentence and maintained Clark's sentence as 20 years at hard labor. This appeal by Clark ensued.[1] For the following reasons, we affirm Clark's conviction, vacate his sentence, and remand the case for resentencing.
DISCUSSION
Sufficiency of the Evidence
In his first assignment of error, Clark argues that the state failed to sufficiently prove that he was guilty of principal to armed robbery and principal to aggravated second degree battery. He asserts that Coleman identified Clark as a participant in the robbery only after sitting through several days of testimony. Further, Clark argues that the circumstantial evidence (i.e. , text messages allegedly sent from Clark's phone after the robbery) was insufficient evidence to prove him guilty because it was shown that India Feazel was in possession of Clark's phone following the crime. We disagree.
Legal Principles
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Hearold , 603 So.2d 731 (La. 1992). See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford , 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robertson , 1996-1048 (La. 10/4/96), 680 So.2d 1165.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Green , 49,741 (La. App. 2 Cir. 4/15/15), 164 So.3d 331 ; State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied , 2012-2667 (La. 5/24/13), 116 So.3d 659. The trier of fact makes credibility determinations and may accept or reject the testimony of any witness.
*1183 State v. Casey , 1999-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 2016-1479 (La. 5/19/17), 221 So.3d 78 ; State v. Gullette , 43,032 (La. App. 2 Cir. 2/13/08), 975 So.2d 753.
When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibility of the witnesses, and this court will generally not second-guess those determinations. State v. Hughes , 2005-0992 (La. 11/29/06), 943 So.2d 1047 ; State v. Clark , 50,137 (La. App. 2 Cir. 9/30/15), 181 So.3d 150, writ denied , 2015-2049 (La. 11/29/16), 211 So.3d 386.
A reviewing court may not impinge on the factfinder's discretion unless it is necessary to guarantee the fundamental due process of law. State v. Hughes , supra ; State v. Clark , supra . The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 1994-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam , 36,118 (La. App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied , 2002-3090 (La. 11/14/03), 858 So.2d 422.
Louisiana R.S. 14:64 provides that "armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." To convict a defendant of armed robbery, the state is required to prove: (1) a taking (2) of anything of value (3) from the person or in the immediate control of another (4) by the use or force of intimidation (5) while armed with a dangerous weapon. State v. Robinson , supra . In order to enhance the sentence under La. R.S. 14:64.3, the state is required to prove that the dangerous weapon used in the commission of the robbery was a firearm. State v. Robinson , supra ; State v. Love , 50,238 (La. App. 2 Cir. 1/13/16), 185 So.3d 136, writ denied , 2016-0317 (La. 2/10/17), 215 So.3d 699.
Louisiana R.S. 14:34.7 provides that "aggravated second degree battery is a battery committed with a dangerous weapon when the offender intentionally inflicts serious bodily injury." Under the statute, "serious bodily injury" is defined as "bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death." La. R.S. 14:34.7(B)(3). Specific criminal intent is that state of mind which exists when circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the defendant's actions. State v. Bishop , 2001-2548 (La. 1/14/03), 835 So.2d 434. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Fields , 42,761 (La. App. 2 Cir. 1/9/08), 973 So.2d 973, writ denied , 2008-0469 (La. 9/26/08), 992 So.2d 983.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit *1184 the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. A person who aids and abets another in a crime is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending upon the mental element proved at trial. State v. Watson, 397 So.2d 1337 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981) ; State v. White , 42,725 (La. App. 2 Cir. 10/24/07), 968 So.2d 901. It is a general principle of accessorial liability that when two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts but also for the acts of the other, including deviations from the common plan which are the foreseeable consequences of carrying out the plan. State v. Smith , 2007-2028 (La. 10/20/09), 23 So.3d 291.
Testimony
India Feazel testified that Lynn Clark, Jr. was her boyfriend and that on April 20, 2016, he picked her up and together they went to the apartment of Zackary Raburn and Stephanie Jacobs in Arcadia, Louisiana. After a time, when Raburn did not come home, Feazel and Clark went to Feazel's house. At approximately midnight, Raburn texted Feazel and came to her house. Clark, Feazel, and Raburn got high on methamphetamine and then left in Jacobs' vehicle. While in Jacobs' vehicle, Raburn realized that a bag he believed to contain synthetic marijuana actually contained tobacco. Raburn stated that LaDarrius Coleman had ripped him off and that Raburn was "going to get him."
Clark and Feazel picked up Jamie Seguin's white SUV from Feazel's house, and stopped at Raburn's apartment to drop off his vehicle around midnight. Jacobs testified that the men discussed Raburn being scammed by Coleman and what to do about it. The group agreed that Feazel would get Coleman to meet up with her and the men could then talk to him. Raburn testified that Clark suggested that Feazel text Coleman so that they could "beat him up, whatever" and get Raburn's money back. They retrieved some dark hoodies from Raburn's apartment. Jacobs testified that she did not want Raburn to leave with Feazel and Clark, but he went anyway and did not return for four to five hours.
Raburn got into the SUV and they picked up Josh Lofton, Feazel's brother, and drove to Ruston. Raburn discussed paying Coleman back for selling him tobacco, and Clark and Raburn both discussed "scaring" Coleman. Raburn testified that Clark was the only person armed with a gun, identified as a .45 or a 9mm Glock, and that Clark was "very encouraging" when Raburn said that he wanted to beat up Coleman. Feazel confirmed that Clark was the only person armed with a gun. Feazel testified that she texted Coleman and he responded around 2:30 a.m. The group then traveled to Arcadia to initiate their plan to lure Coleman to an abandoned trailer park on Wire Road, Arcadia, Louisiana. Lofton would remain in the vehicle with Feazel while she picked up Coleman and delivered him to the location where Raburn and Clark would be waiting.
Feazel dropped Raburn and Clark off at Wire Road around 3:00 a.m., then went to pick up Coleman and his friend Chuckie. Coleman testified that Feazel picked him up around 10:00 to 11:00 p.m. so that they could have sex for a few dollars. Feazel dropped Chuckie off and proceeded to Wire Road, sending Raburn a text message at 3:23 a.m. to let him know that she was on her way with Coleman. Coleman was unaware that Lofton was lying on the back seat of the SUV. At 3:28 a.m. Feazel texted Raburn that she was "about to pull *1185 up." Raburn responded at 3:36 a.m. with "go down the road." Feazel explained that she initially passed up the "horseshoe" on Wire Road and had to turn around. Raburn testified that it was actually Clark texting with Feazel from his phone at that time. Raburn testified that while he and Clark were waiting for Coleman to arrive, Clark had handed him the gun.
Feazel testified that after the vehicle stopped, Lofton "popped up" from the back seat and forced Coleman from the vehicle. Coleman could not recall where Feazel took him, remembering only that it was in the woods. Raburn, using the gun, and Clark then forced Coleman to the back of the vehicle. Lofton testified that Clark was wearing a black hoodie, gloves, and black pajama-like pants. Coleman testified that the men took his cell phone, cigarettes, cocaine, an X pill, and some marijuana from his pockets. Raburn testified that Lofton took the items from Coleman, while Lofton testified that it was either Clark or Raburn who robbed Coleman.
Coleman stated that all three men hit him and were "just all right there." He testified that he was struck with hands and with weapons. Raburn fired the gun into the air, while Clark and Lofton threatened to cut Coleman using Raburn's knife. Coleman said that, when he heard the first gunshot, he fell to the ground. Raburn testified that he, Clark, and Lofton intended to terrorize Coleman.
Raburn testified that, after Coleman had been beaten and the first shot fired, he knelt beside Coleman and told him that he should, and could, kill him but was not going to. Raburn testified that Clark questioned him about leaving Coleman alive, reminding him that Coleman knew where he lived and that he had children. Raburn stated that, when he thought about his children, he snapped and shot Coleman in the head.
Lofton testified that Raburn and Clark were never more than ten yards apart during the entire incident. Raburn testified that Clark was standing beside him when Coleman was shot. Feazel testified that, after approximately three minutes of arguing, she heard a gunshot, then she heard a second gunshot approximately one minute later. Jacobs testified that Raburn later told her that Clark's only involvement was to state "if you leave [Coleman] here, he's going to go back to your apartment and kill your wife and kids," as they were walking back to the vehicle.
All three men and Feazel got back into the vehicle. The gun was placed on the center console and Clark retrieved it. Coleman was left, severely wounded, at the scene. Feazel testified that, after leaving the scene, everyone was excited and scared, even taking turns shooting the gun out of the vehicle windows. Raburn denied shooting the gun from the vehicle. Lofton testified that Raburn and Clark were "gloating" over shooting Coleman. Feazel testified that Raburn handed Coleman's cell phone to Clark, who broke the phone and threw it from the window. Lofton recalled smoking Coleman's marijuana, while Feazel and Raburn recalled smoking Coleman's cigarettes.
Feazel dropped off Lofton and Raburn at their homes, then returned to her home with Clark around 5:00 to 5:30 a.m. She testified that she took Clark back to Grambling around daylight. She did not see him again until April 24, 2016, when they stayed at a hotel in Ruston together.
Rebekah Landes testified that on the morning of April 24, 2016, she and her aunt discovered a man lying in the road near her home on Wire Road in Arcadia, Louisiana, wearing only his boxers. Jeanie Landes, Rebekah's mother and a nurse, was called to come to the scene. Rebekah reported that the man was slightly responsive, *1186 had been shot, and appeared to have been beaten. Phillip Picou, a paramedic who responded to the scene, testified that Coleman was very disoriented, had a gunshot wound to his head near his right eyebrow, and was covered in insect bites. Rusty Gilbert, a flight paramedic, testified that he transported Coleman from Bienville Medical Center to University Health in Shreveport. He also observed a gunshot wound to Coleman's head.
The following day, in the woods across the street from her house, Rebekah's dog dug up a bloody T-shirt. Rebekah and Jeanie also discovered nearby a man's wallet, headphones, and a bag of synthetic marijuana. Deputy Sheronda Bell, an investigator with the Bienville Parish Sheriff's Office, collected the evidence, which included a .45 caliber spent shell casing. On May 3, 2016, she returned to the scene and collected an additional .45 caliber spent shell casing.
Deputy Bell testified that on April 28, 2016, Joshua Lofton voluntarily reported to the Bienville Parish Sheriff's office and provided information which led to three suspects: India Feazel, Zachary Raburn, and Lynn Clark, Jr. Dep. Bell interviewed Feazel and obtained a warrant for Raburn's arrest. Following a search of Raburn's home, which uncovered a cell phone and narcotics, Raburn gave an interview and took Sergeant Darrell Mills to the scene of the incident involving Coleman. A hoodie belonging to Clark was also seized during the search of Raburn's apartment.
Text messages from April 19 to April 29, 2016, were recovered from Raburn's cell phone. The pertinent messages were entered into evidence. A cell phone was also secured from Feazel at the time of her arrest, but no text messages were recovered. The text messages from Raburn's cell phone corroborated Feazel's testimony.
As a result of his injuries, Coleman stayed in ICU critical care for two to three weeks. Linda Henderson, a home healthcare worker who had known Coleman for over 20 years, testified that Coleman was very different in appearance when he returned home after the shooting. She stated that he could not walk like he used to, the right side of his head was concave where a portion of his skull had been removed, he had difficulty speaking, and he was very forgetful. Coleman testified that he had difficulty finding the right words and tried not to walk much.
Analysis
The evidence presented sufficiently showed that Clark was a principal to the armed robbery of Coleman in that Clark was "concerned in the commission of" taking something of value from Coleman by the use of force and intimidation, while armed with a firearm. The testimony of witnesses showed that Coleman's cell phone, cigarettes, cocaine, X pill, and marijuana were taken from Coleman's person at gunpoint after he was forced from the vehicle by Lofton, Clark, and Raburn. These items were clearly of value to Coleman. Furthermore, Feazel and Raburn testified that the firearm used was supplied by Clark.
The evidence presented also sufficiently supports that Clark was a principal to the aggravated second degree battery of Coleman in that Clark was "concerned in the commission of" the intentional infliction of serious injury upon Coleman with a dangerous weapon. Raburn testified that Clark was the one who suggested that Feazel contact Coleman so that the men could beat him up. Coleman testified that once he was forced from the vehicle, all three men struck him with their hands and weapons. Finally, Coleman was shot in the head with a firearm, clearly a dangerous weapon. While Raburn testified that the *1187 men intended to terrorize Coleman, he also testified that he initially did not intend to shoot Coleman but was encouraged to do so by Clark, who implied that if Coleman were left alive he would come to Raburn's apartment and harm Raburn's children. Raburn then shot Coleman in the head. The trier of fact could have reasonably inferred from these circumstances, Clark's provision of the firearm and encouragement, that Clark actively desired the consequences of his actions, the shooting of Coleman. Coleman clearly sustained serious bodily injury as a result of the beating and shooting. He was nearly unresponsive when he was found several days after the shooting, spent several weeks in ICU after being airlifted to University Health, and continues to suffer from difficulty speaking and walking.
The evidence presented at trial was more than sufficient to prove that Clark was guilty of principal to armed robbery with a firearm and principal to aggravated second degree battery. The witnesses clearly testified that Clark participated in the planning of the crime, was present with the other participants at the scene of the crime, encouraged Raburn to shoot Coleman, and provided the firearm that was used. Furthermore, the evidence showed that force or intimidation was used to take something of value from Coleman and that Clark actively participated in the intentional use of force or violence against Coleman with the intent to inflict serious bodily injury. The jury clearly found the testimony of the state's witnesses credible. This court does not assess the credibility of the witnesses or reweigh evidence. Considering the evidence in a light most favorable to the prosecution, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that Clark was guilty as charged. This assignment of error is without merit.
Exclusion of Victim from Order of Sequestration
In his second assignment of error, Clark asserts that the trial court erred in allowing Coleman to remain in the courtroom throughout the testimony of all state witnesses because it influenced his testimony. Because Coleman was not able to identify Clark prior to trial as a person involved in the offense but subsequently made an in-court identification of Clark after sitting through several days of testimony, Clark argues that his constitutional right to a fair trial was violated because Coleman's testimony was not free of influence and did not come from his own memory. Clark asserts that the trial court could have taken remedial measures to prevent such influence on Coleman's testimony, such as having Coleman testify prior to the other witnesses.
Louisiana C. Cr. P. art. 764 and La. C. E. art. 615 permit the exclusion of witnesses from the courtroom or from a place where they can see or hear the proceedings. An order of sequestration is intended to assure that a witness will testify concerning his own knowledge of the case without being influenced by the testimony of prior witnesses and to strengthen the role of cross-examination in developing facts. State v. Kimble , 407 So.2d 693 (La. 1981) ; State v. Higginbotham , 46,975 (La. App. 2 Cir. 4/25/12), 122 So.3d 1, writ denied , 2012-1718 (La. 5/24/13), 116 So.3d 658. The victim of the offense is excluded from an order of sequestration. La. C.E. art. 615(B)(4). In examining sequestration violations, the reviewing court considers the facts of each case to determine whether or not prejudice resulted. State v. Holden , 45,038 (La. App. 2 Cir. 1/27/10), 30 So.3d 1053, writ denied , 2010-0491 (La. 9/24/10), 45 So.3d 1072.
In State v. Lyles , 2003-141 (La. App. 5 Cir. 9/16/03), 858 So.2d 35, the court found *1188 no error in permitting the juvenile victims to remain in the courtroom during the playing of their videotaped interviews. In State v. Johnson , 2001-2334 (La. App. 4 Cir. 12/4/02), 833 So.2d 508, the court found no error in a daughter's presence in the courtroom during her mother's testimony because both the daughter and mother were victims in the case, and were not subject to the sequestration order. In State v. J.M. , 2006-624 (La. App. 3 Cir. 11/2/06), 941 So.2d 686, the court found that there was nothing in the record to indicate that the victims, who were permitted to remain in the courtroom during each other's testimony, were testifying in support of, or influenced by each other's testimony.
In State v. Porter , 2013-0357 (La. App. 4 Cir. 10/8/14), 151 So.3d 871, writ denied , 2014-2353 (La. 9/11/15), 176 So.3d 1037, the trial court allowed the victim's mother and grandmother, who were testifying witnesses, to remain in the courtroom after they testified. The defendant argued that the trial court erred when the victim's mother was permitted to provide rebuttal testimony after she was present in the courtroom to hear other witnesses' testimony, including the defendant's testimony. The Porter court noted that the trial court attempted to balance the exceptions against the advantages a witness could receive by sequestering the victim's mother and grandmother and that the jury was instructed on their duty to determine credibility of witnesses. Id. at 887. The court held that, under those circumstances, the trial court did not abuse its discretion by allowing the victim's mother to remain in the courtroom after her testimony and allowing her to testify as a rebuttal witness. Id.
Here, during the course of the investigation, Coleman was shown a lineup containing Clark but was unable to identify Clark as one of the suspects involved in the robbery. However, during trial, Coleman identified Clark as being involved in the shooting. Coleman denied that being in the courtroom had affected the veracity of his testimony. However, Coleman did admit that hearing the testimony of other witnesses had helped him to remember "a little bit."
Clearly, as the victim, Coleman had the right to remain in the courtroom and was not subject to the sequestration order. The trial court appropriately weighed the purpose of the sequestration order against the statutory provision excluding victims from a sequestration order and advised the jury that they ultimately weigh the credibility of witnesses based on all of the testimony they hear and see. Furthermore, a witness's failure to identify the suspect at a pretrial lineup does not constitute grounds to bar an in-court identification, but, rather, goes to the weight of that witness's testimony; evidence may be introduced to explain any discrepancy. State v. Long, 408 So.2d 1221 (La. 1982) ; State v. Marshall , 44,121 (La. App. 2 Cir. 4/8/09), 6 So.3d 1051, writ denied , 2009-1113 (La. 1/22/10), 25 So.3d 130. Coleman's testimony was not the sole, or even the most compelling, evidence against Clark. The totality of the corroborating evidence identified Clark as a participant in the crime; therefore, Clark fails to show he was substantially prejudiced by Coleman's presence in the courtroom during the entirety of the trial. Given the foregoing, there was no abuse of discretion, and this assignment of error is without merit.
Habitual Offender Proceeding and Errors Patent
In his third assignment of error, Clark asserts that the trial court erred in failing to fully justify on the record why it found clear and convincing evidence that he deserved relief under *1189 State v. Dorthey , 623 So.2d 1276 (La. 1993), because the mandatory minimum sentence he faced as a second offender was constitutionally excessive. While Clark does not object to the trial court's downward departure from the statutory minimum, out of an abundance of caution he raises the issue and argues the case should be remanded with instructions for the trial court to state clearly for the record that it found that the statutory minimum sentence was excessive, its reasons for ruling, and its justification for offering Dorthey relief. Because there are errors patent which necessitate that we vacate Clark's habitual offender sentence and remand this matter for resentencing, we do not address whether Clark's sentence complied with the requirements of Dorthey .
Pursuant to La. C. Cr. P. art. 920, we have examined the record for errors patent and find that the trial court failed to comply with the requirements of La. R. S. 15:529.1(D). The habitual offender bill of information lists Clark's prior felony conviction as well as both of the instant convictions, asserting that Clark is a second-felony habitual offender. Following Clark's habitual offender hearing, the trial court stated in pertinent part:
But in this court's opinion I think that Mr. Clark should not get more than what the actual shooter got. So therefore I'm going to find that he's a habitual offender but I'm not going to vacate the sentence and add any additional time. I'm going to leave it at the twenty years.
Notably, the court minutes accurately reflect the transcript.
When the court adjudicates a defendant a habitual felony offender, "the court shall sentence him to the punishment prescribed in this Section, and shall vacate the previous sentence if already imposed, deducting from the new sentence the time actually served under the sentence so vacated. The court shall provide written reasons for its determination." La. R. S. 15:529.1(D)(3). When a defendant's original sentence on an underlying offense has not been vacated by the court at the time of defendant's sentencing as a habitual offender, the original sentence remains in effect and the subsequent sentence as a habitual offender is null and void. State v. Lyles, 17-405 (La. App. 5 Cir. 2/21/18), 239 So.3d 1055. However, where it is obvious that the trial court intended to increase the substantive sentence, and correction of the illegal sentence does not involve the exercise of sentencing discretion, the appellate court may amend to correct, without remanding for resentencing. State v. Bailey , 49,362 (La. App. 2 Cir. 11/19/14), 152 So.3d 1056, writ denied , 2014-2645 (La. 10/2/15), 178 So.3d 988.
Here, the record is clear that the trial court failed to vacate Clark's previous sentence. It is likewise clear that, where the trial court elected to "leave it at the twenty years," the trial court did not intend to increase Clark's substantive sentence. Furthermore, the trial court did not provide written reasons for its findings, stating only its opinion that "Mr. Clark should not get more than what the actual shooter got." Therefore, correcting Clark's sentence would involve the exercise of sentencing discretion and remand to the trial court is required.
Furthermore, La. R. S. 15:529.1(D)(2) requires that following the contradictory habitual offender hearing, the court shall find whether a defendant is a second, third, or fourth felony offender. State v. Thibodeaux , 2012-300 (La. App. 3 Cir. 10/24/12), 100 So.3d 398, 402. Likewise, a trial court must specify which of multiple underlying sentences is being enhanced under La. R. S. 15:529.1. State v. Small , 37,134 (La. App. 2 Cir. 6/27/03), 850 So.2d 1019, writ denied , *1190 2003-2202 (La. 1/30/04), 865 So.2d 75. A sentence that is indeterminate must be set aside and the case remanded for resentencing as the law directs. Id.
Clark was convicted at trial of both aggravated second degree battery, which carries a maximum sentence of 15 years' imprisonment, and armed robbery, committed with a firearm, which carries a maximum 104 years' imprisonment. La. R.S. 14:34.7, 14:64, 14:64.3. However, the trial court did not specify whether Clark's conviction for armed robbery or aggravated second degree battery was used in adjudicating him a habitual offender. As such, it is unclear what the appropriate sentence would be under the habitual offender statute. When sentencing a second felony habitual offender, if the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence of imprisonment shall be for a determinate term not less than one-third the longest term and not more than twice the longest term prescribed for a first conviction. La. R.S. 15:529.1(A)(1). Considering the vast difference in sentencing range for the two crimes of which Clark was convicted, the habitual offender sentence imposed by the trial court is clearly indeterminate and remand is required.
Because we cannot determine from the sentencing proceedings whether the trial court imposed an illegally lenient habitual offender sentence, we pretermit a discussion of Clark's assignment of error that the trial court failed to provide adequate justification for its apparent offer of Dorthey relief and his request for clarification.
CONCLUSION
For the foregoing reasons, the conviction of Lynn Tony Clark, Jr. is affirmed. The habitual offender sentence is vacated and this matter remanded to the trial court for resentencing consistent with this opinion.
AFFIRMED; HABITUAL OFFENDER SENTENCE VACATED; REMANDED FOR RESENTENCING.

The state filed an application for writ of supervisory review seeking review of Clark's habitual offender sentence, a downward departure from the mandatory minimum under State v. Dorthey, 623 So.2d 1276 (La. 1993). This court denied the writ, finding that Clark had already appealed his convictions and sentences and that this issue could be raised and addressed on appeal. State v. Clark , 52,257-KW (La. App. 2 Cir. 5/10/18).