Judgment rendered November 19, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,449-KA
No. 56,450-KA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                         Appellee

versus

DAVID JUNIOR PATTON                        Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court Nos. 240,215; 240,215B

Honorable Charles A. Smith, Judge

* * * * *

HARVILLE LAW FIRM, LLC                     Counsel for Appellant
By: Douglas Lee Harville

JOHN SCHUYLER MARVIN                       Counsel for Appellee
District Attorney

RICHARD RUSSELL RAY
DALE NEWTON MONTGOMERY II
Assistant District Attorneys

* * * * *

Before COX, THOMPSON, and MARCOTTE, JJ.

**MARCOTTE, J.**

This criminal appeal arises from the 26th Judicial District Court, Parish of Bossier, the Honorable Charles A. Smith presiding. David Junior Patton ("Mr. Patton") was found guilty of two counts of indecent behavior with a juvenile, in violation of La. R.S. 14:81(A)(1) and (H)(1), and one count of molestation of a juvenile, in violation of La. R.S. 14:81.2(A)(1) and (B)(1). The trial court sentenced him to 5 years' imprisonment at hard labor on each of the indecent behavior with a juvenile convictions and 9 years' imprisonment at hard labor on the molestation of a juvenile conviction. The sentences for the indecent behavior with a juvenile convictions were to be served concurrently with each other but were to be served consecutively to his sentence for the molestation of a juvenile conviction. Mr. Patton now appeals. For the following reasons, we affirm his conviction and sentence.

### FACTS

On October 4, 2021, Mr. Patton was charged by bill of information with two counts of indecent behavior with a juvenile, in violation of La. R.S. 14:81(A)(1) and (H)(1). Specifically, the state alleged that, between January 1, 2003, and January 1, 2006, Mr. Patton, with the intention of arousing or gratifying the sexual desires of either person, committed any lewd or lascivious act upon the person or in the presence of any child under the age of 17, where there was an age difference of greater than two years between the two persons, namely P.P., date of birth 2/5/1997, and L.P., date of birth 9/30/1998.

On October 4, 2021, Mr. Patton was also charged by bill of information with molestation of a juvenile in violation of La. R.S. 14:81.2(A)(1) and (B)(1). Specifically, the state alleged that, between

January 1, 2003, and January 1, 2006, Mr. Patton, being over the age of 17, committed any lewd or lascivious act upon the person or in the presence of any child under the age of 17, namely P.P. The state further alleged that there was an age difference of greater than two years between the two persons and that Mr. Patton had acted with the intention of arousing or gratifying the sexual desires of either person. Finally, the state alleged Mr. Patton had used force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or the use of influence by virtue of a position of control or supervision over the juvenile.

On November 4, 2021, Mr. Patton entered pleas of not guilty after waiving formal arraignment. A jury trial was held on April 23-25, 2024. As the trial was about to begin, the state noted that the victims would be present during the trial. The defense objected and made an oral motion to have the victims excluded from trial. However, the trial court ruled that P.P. and L.P. would not be sequestered because victims of crimes are permitted to be present in the courtroom during the trial.

The following evidence was adduced at trial.

Detective Shannon Mack ("Det. Mack") was the case agent in charge of investigating Mr. Patton. She testified that she learned of Mr. Patton's misconduct in the course of investigating his older brother, Jesse Patton, for molestation of his two daughters. She stated that she interviewed P.P. and L.P. about their tumultuous childhood living in various trailer parks and apartments with two parents consumed with substance abuse issues. Det. Mack also interviewed Mr. Patton, and her 3-hour interrogation of him was played for the jury. Det. Mack testified as to how P.P. and L.P. remembered there was a TV and an armoire or entertainment center in a room where Mr.

2

Patton allegedly watched pornographic movies and masturbated, while physically making P.P. and L.P. watch the movies.

P.P. was present for Det. Mack's testimony, and she testified next. P.P. first testified about an incident that occurred at a trailer park home when she was 4 or 5. P.P. alleged that Mr. Patton was playing "Superman" with her, a game in which he would lie on his back and hold her in the air with his arms and legs. However, P.P. stated that they were both nude and that Mr. Patton tried to place her vaginal area on his penis. He stopped when she defecated on him.

On cross-examination, she slightly changed her story about what she did afterward. At first, P.P. said she took a shower after this incident. She later changed her answer to state that Mr. Patton took a shower to clean himself after she defecated on him.

P.P. also testified that Mr. Patton would force P.P. and L.P. to watch pornographic movies with him while he masturbated. She stated that these incidents occurred at least twice a week for almost 2 years at the Southern Living trailer park. P.P. would have been 9 or 10 at that time. On cross-examination, she admitted that she never saw Mr. Patton ejaculate during these incidents.

P.P. further testified about events that allegedly occurred at an apartment across from a middle school in Haughton. At that location, she said that Mr. Patton would use dolls to demonstrate sexual acts to her and L.P. Also at the Haughton location, P.P. testified that Mr. Patton would rub his penis on her leg while they were in bed taking naps. P.P. said that she did not know if Mr. Patton ever ejaculated on her leg.

P.P. also testified that in the living room at the Southern Living trailer park there was an entertainment center that she and L.P. would place cats on top of and then nudge off to see if they would always land on their feet. When questioned about the TV, P.P. testified as follows:

Q: Okay. If I told you there was, been an allegation that there was no, never a TV at the trailer at Southern Living what would your response be to that?

A: That would be false. There was definitely a TV there.

Q: Okay. Can you describe the TV?

A: Yeah, so, uh, it was one of those TVs that had the big backs, I don't know the correct name for them, but it was – they're heavy.

Q: Okay. Is it like a old school TV?

A: Yeah. yeah.

Q: Non flat screen?

A: Like one of them Panasonic ones, the big ones.

Q: It was about this deep?

A: Yes.

Q: Okay.

A: And it had a VHS tape not connected to it, it was in this rectangular, um, where it was meant to go and the TV would be on top and it was in an entertainment center.

Q: Okay. What else do you remember about the entertainment center that you connect with Southern Living trailer park?

A: Well, we used to throw our cats off of there to see if they land on their feet. We used to pick up stray cats in the neighborhood, bring them home.

Q: Okay. And when – and those were – you had two that were your pet, you kind of considered your –

A: Our pets, yeah.

4

Q:     -- pet or at some point?

A:     Yes, um, I believe – her name always kind of changed from Snowbell to Snowball.  She was a white cat.  And then we had Pumpkin.  He was a little orange tabby.  He was cute.

Q:     Okay.  Why is it that you can remember that entertainment center that the TV was located in, in correlation with the cats?

A:     Um, well, me and my sister found out that cats had nine lives and they always would land on their feet no matter how high you would throw them up.  We didn't, you know, have a lot to do so we thought why not try it and see if it's real and we put them on top of the TV because, uh, the entertainment center because it was really tall and they would jump and they would land on their feet so when we got bored we would just put our cats up there.

P.P. also stated that she was 10 or 11 when the Louisiana Department of Children and Family Services ("DCFS") took her and her sisters away from Mr. Patton and their mother, Deanna Howell.  On cross-examination, P.P. admitted that she never disclosed to DCFS that Mr. Patton molested her.

P.P. stated that there were other incidents.  However, she did not testify in detail about any such incidents.

L.P. testified next.  She was present in court for the testimony of both Det. Mack and P.P.  L.P. testified that she and her sister were taken away from Mr. Patton and her mother, Ms. Howell, in 2007 or 2008.  L.P. talked about one incident in which Mr. Patton was masturbating while watching a pornographic movie on TV in the living room of their trailer at Southern Living trailer park while she and P.P. were both present.  L.P. recalled Mr. Patton asking her to come sit by him while he masturbated.

L.P., who was only 4 years old at the time, testified similarly to her older sister regarding the TV:

Q:   And you also told Detective Mack that that one instance you fully remember; correct?

A:   Uh, to – what I can remember that's what I fully remember.

Q:   Okay.  And this happened at Southern Living?

A:   That's correct.

Q:   And it started out with you in the living room with P.P. playing?

A:   That's correct.

Q:   You were on the floor?

A:   That's correct.

Q:   And at some point your dad started watching porn?

A:   I remember it being on the TV.  I remember looking up and seeing it on the TV.

Q:   So it was already playing?

A:   It was already playing.

Q:   Okay.  And then he asked you to come sit with him?

A:   That's correct.

Q:   And before you could stand up – or you did stand up and P.P. said no? And grabbed your arm?

A:   Correct.

Q:   And that was the end of it?

A:   I don't know if that's the end of it. I – that's all I can remember.

Q:   So you don't remember him bringing you to the couch and making you sit next to him and covering your – him grabbing your arms and your head to make you watch it?

A:   No, I – I don't.

Q:   And you remember there was a TV at Southern Living?

A:   That's correct.

6

On cross-examination, L.P. admitted that she did not disclose any sexual abuse by Mr. Patton when she first spoke to Det. Mack about alleged sexual abuse by Jesse Patton. Rather, L.P. first alleged sexual abuse by Mr. Patton three weeks after speaking with him during a Facebook Messenger "phone call."

Ms. Howell was the state's final witness. She testified that she, Mr. Patton, and their daughters lived in Springhill for 2 or 3 years. L.P. would have been about 3 and P.P. would have been around 4. Ms. Howell and Mr. Patton later moved to Thurman Road in Haughton, a property owned by Mr. Patton's mother, Janet Rankin. Ms. Howell remembered a TV and an entertainment center at Thurman Road. She also remembered a wood console TV at Southern Living. She stated that at the time they were living at the Thurman Road property, L.P. would have been about 4 and P.P. would have been about 5. They lived there for 2 to 3 years.

Ms. Howell said she remembered kicking Mr. Patton out of the Thurman Road trailer after she walked in and saw him watching pornographic movies with all of his daughters in the same living room. Ms. Howell said they later moved to the Southern Living trailer park and lived there for about a year. She said she left Southern Living in about 2007. The state rested.

The defense called Mr. Patton's mother, Ms. Rankin. Ms. Rankin testified that Mr. Patton's children, including L.P. and P.P., were removed from the home by DCFS in 2004. She said that she had formal custody of P.P. in September 2007. She stated that Mr. Patton lived at Southern Living from December 2006 to February 2007.

7

Rachel Rhodes, Mr. Patton's fiancée, testified about a July 22, 2021, Facebook Messenger "phone call" between Mr. Patton and L.P. She claimed that during the call, L.P. asked Mr. Patton to support her sexual assault allegations against Jesse Patton, but Mr. Patton would not do so. She also testified that Mr. Patton was arrested for the instant charges two days before their scheduled wedding.

Kayla Greer, Mr. Patton's sister, was born in 1994. She testified that Mr. Patton lived at the Southern Living trailer for 3 months. Johnny Chancellor, Ms. Rankin's brother, testified that he lived at the Thurman Road trailer from March 2006 to September 2006.

Mr. Patton testified in his own defense. He denied sexually abusing his daughters and denied all claims related to the charges in this case. The defense rested.

The jury returned unanimous verdicts of guilty as charged on all counts. Mr. Patton filed a motion for post-verdict judgment of acquittal and a motion for a new trial; both were denied.

On August 8, 2024, the trial court sentenced Mr. Patton to 5 years of imprisonment at hard labor on each of the indecent behavior with a juvenile convictions and to 9 years of imprisonment at hard labor on the molestation of a juvenile conviction, with credit for time served. The sentences for the indecent behavior with a juvenile convictions were to be served concurrently with each other but were to be served consecutively to the sentence for molestation of a juvenile conviction.

The trial court informed Mr. Patton of his appellate and post-conviction relief time constraints. He now appeals.

**DISCUSSION**

*Sufficiency of the Evidence*

Mr. Patton argues that there was insufficient evidence for his convictions. He claims that retribution, not recollection, was the driving force behind P.P.'s and L.P.'s testimonies. In support, he points to the fact that P.P. and L.P. failed to disclose Mr. Patton's alleged abuse either while in DCFS custody or in counseling. Rather, he claims that P.P.'s and L.P.'s allegations only arose after Mr. Patton refused to support sexual assault allegations against his brother Jesse Patton. Mr. Patton further claims that Ms. Howell's allegations are tainted with bias since they only arose shortly before Mr. Patton was to be remarried.

Mr. Patton argues that P.P.'s and L.P.'s testimony was undermined by an inconsistency – the alleged location of the TV in the trailer. Mr. Patton claims that whether the TV was on an entertainment center or resting on the floor was a crucial fact in P.P.'s and L.P.'s allegations that Mr. Patton masturbated while they were forced to watch pornographic movies.

Mr. Patton further argues that P.P.'s testimony was factually inaccurate due to her claim that he masturbated in front of her twice a week for two years at the Southern Living trailer. Mr. Patton avers that that testimony conflicted with the testimony of P.P.'s mother, who said they only lived at the Southern Living trailer for a year, and

his own testimony that they only lived at the Southern Living trailer for three months.

Mr. Patton argues that P.P.'s and L.P.'s inconsistencies and factual impossibilities were too great for any reasonable trier of fact to ignore; therefore, the evidence was insufficient to prove he was guilty beyond a reasonable doubt. He requests this court to reverse his conviction, vacate his sentence, and enter a judgment of acquittal.

The state argues that the record clearly indicates that the evidence was sufficient to support a conviction for indecent behavior with juveniles and molestation of a juvenile. The state asserts that, contrary to Mr. Patton's claims, P.P.'s testimony regarding the TV and the incidents that occurred at the Southern Living trailer was generally consistent with that of L.P. and their mother. The state points to P.P.'s specific testimony about the TV, in which she vividly recalls placing cats "up there" on top of a large TV to see if they would land on their feet. The state emphasizes that she was five years old at the time, so the fact that the TV seemed large to her is understandable.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to

substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *Id*. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Morehead*, 55,825 (La. App. 2 Cir. 10/23/24), 400 So. 3d 302, *writ denied*, 24-01434 (La. 2/19/25), 400 So. 3d 932. A reviewing court accords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Brown*, 55,466 (La. App. 2 Cir. 3/13/24), 381 So. 3d 1007, *writ denied*, 24-00452 (La. 11/20/24), 396 So. 3d 69; *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 5/19/17), 221 So. 3d 78.

La. R.S. 14:81(A)(1) defines the crime of indecent behavior with juveniles as:

A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:

(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense[.]

11

In *State v. Jones*, 10-0762, n. 1 (La. 9/7/11), 74 So. 3d 197, the supreme court noted that it had earlier defined "lewd and lascivious" in the context of La. R.S. 14:81(A) as an act which is "lustful, obscene, indecent, tending to deprave the morals in respect to sexual relations, and relating to sexual impurity or incontinence carried on in a wanton manner."

To convict, the state must prove and the jury must find (1) that the offender committed a lewd or lascivious act upon the person of or in the presence of the victim, (2) that the act described was a lewd or lascivious act, (3) that the victim was under the age of 17 and more than two years younger than the defendant at the time of the alleged offense, (4) that the defendant was at least 17 years of age at the time of the alleged offense, and (5) that the defendant acted with a specific intent to arouse or gratify his own sexual desires or the sexual desires of the victim. *State v. Collins,* 52,885 (La. App. 2 Cir. 9/25/19), 280 So. 3d 891.

Here, the state provided evidence that Mr. Patton forced his two young daughters to watch pornographic movies in his presence while he masturbated twice a week for two years in the living room of a trailer home. In our view, this conduct qualifies as a lewd act meant to gratify his own sexual desires and performed in the presence of the victim, who was under the age of 17 and more than two years younger than him at the time.

To convict an accused of molestation of a juvenile, the state must prove beyond a reasonable doubt that the defendant (1) was over

the age of 17 and more than two years older than the victim; (2) committed a lewd or lascivious act upon the person or in the presence of any child under the age of 17; (3) had the specific intent to arouse or gratify the sexual desires of himself or the victim; and (4) committed the act by use of force, duress, psychological intimidation or by the use of influence by virtue of a position of control or supervision over the juvenile. La. R.S. 14:81.2; *State v. Hernandez*, 55,256 (La. App. 2 Cir. 8/9/23), 369 So. 3d 962.

The harsher penalty provision for molestation of a juvenile where the offender has control or supervision over a juvenile exists because an offender who has control or supervision over a juvenile is in a position of trust. *Id*. The phrase "influence by virtue of a position of control or supervision" in La. R.S. 14:81.2 permits finding evidence of supervision or control by relatives, friends, and neighbors of young victims. *Id*. Living in the home with the victim, acting as a father figure to the victim, and exercising emotional control over the victim have been found to be sufficient to support a finding of supervision or control. *Id.*

In this case, it is undisputed that at the time of the offense, P.P. was only 4 or 5 years old, Mr. Patton was over the age of 17, and the age difference between P.P. and Mr. Patton was more than two years. The only issues, therefore, are whether Mr. Patton's conduct was considered "lewd and lascivious" and whether he had a position of supervision or control over P.P. After reviewing this record in its entirety, we find that the evidence was sufficient to prove that Mr. Patton committed the instant offense.

13

First, P.P. testified that Mr. Patton would play a game of naked "Superman" with her in which he would attempt to place her vaginal area near his penis, and that he only stopped when P.P. defecated on him. P.P. further testified that Mr. Patton would use dolls to demonstrate sexual acts to her, and he would rub his penis on her leg while she was in bed trying to nap.

Mr. Patton was P.P.'s father, who lived with her at the time. Thus he clearly was "in a position of supervision or control" over her. Given the totality of the testimony, we find that his actions were lewd and lascivious and reflected Mr. Patton's intent to excite himself by virtue of his position of control or supervision over P.P.

We find Mr. Patton's argument regarding whether the TV was higher up in an entertainment center or in a console on the floor to be beside the point. For one, it is reasonable to believe that a 4 or 5 year old girl would consider anything beyond her reach as tall. Secondly, any slight inconsistencies in P.P.'s, L.P.'s, and Ms. Howell's testimony regarding the placement or height of the TV were fully considered by the jury; credibility determinations are matters of weight, not sufficiency and as such, do not cause the evidence to be insufficient to convict. In our view, the testimonies of the young children are not inconsistent simply because there may not have been a tall entertainment center in the living room of the trailer, especially considering their age at the time. Accordingly, this assignment of error is without merit.

*Sequestration of Victims*

Mr. Patton argues that the trial court erred when it denied his motion to sequester P.P. and L.P. before their trial testimony. He claims that this error allowed P.P. and L.P. to listen to Det. Mack's testimony and then shape their own testimony accordingly. Mr. Patton asserts that this deprived him of his fundamental constitutional right to present an effective defense through cross-examination.

The state argues that the trial court was correct in denying Mr. Patton's oral motion to sequester L.P. and P.P. In support, the state points to La. C.E. art. 615(B)(4) and well-settled jurisprudence holding that victims of crimes, such as L.P. and P.P., are allowed to remain in the courtroom for the entirety of a trial.

La. C.E. art. 615 provides, in part:

A. As a matter of right. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.

B. Exceptions. This Article does not authorize exclusion of any of the following:

....

(4) The victim of the offense or the family of the victim.

In addition to the statutory allowance, well-settled jurisprudence allows the victims of crimes such as P.P. and L.P. to remain in the courtroom for the entirety of a trial. *State v. Clark*, 52,256 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1178; *State v.*

*McGinnis*, 04-1286 (La. App. 5 Cir. 10/6/05), 917 So. 2d 471, *writ denied*, 05-2469 (La. 4/28/06), 927 So. 2d 283.

In *State v. Strother*, 43,363 (La. App. 2 Cir. 8/20/08), 990 So. 2d 130, *writ denied*, 08-2289 (La. 5/15/09), 8 So. 3d 580, the trial court allowed the victim and the victim's mother to remain in the courtroom during other witnesses' testimony and this court ruled that the trial court did not abuse its discretion.

In *State v. Porter*, 13-0357 (La. App. 4 Cir. 10/8/14), 151 So. 3d 871, *writ denied*, 14-2353 (La. 9/11/15), 176 So. 3d 1037, *abrogated on other grounds by State v. Sagastume*, 22-01824 (La. 12/8/23), 379 So. 3d 1243, the defendant was prosecuted for sexual battery, aggravated rape, and second-degree kidnapping. The trial court allowed the victim's mother to testify as a rebuttal witness after she had been present in the courtroom for another witness's testimony. The court of appeal held that the trial court did not abuse its discretion and appropriately weighed the purpose of the sequestration order against the provision of the sequestration statute excluding victims and victims' family members from a sequestration order.

In addition to the jurisprudence noted above, Louisiana Code of Evidence article 615(B)(4) does not authorize the exclusion of "the victim of the offense or the family of the victim." Here, we find no abuse of discretion in the trial court's ruling permitting L.P. and P.P. to be present in the courtroom for Det. Mack's testimony. The trial judge was authorized by La C.E. art. 615 B(4) and the jurisprudence

16

to permit the victims to remain in the courtroom throughout the proceedings. There is no merit to this assignment of error.

*Closing Argument*

Mr. Patton argues that the state's closing argument misstated the law and allowed the jury to convict him for indecent behavior with juveniles, P.P. and L.P., based on an insufficient factual basis.

La. C. Cr. P. art. 841(A) provides:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

Unless there is an objection made at the time of the alleged improper closing argument, a party waives appellate review of the issue. Such a claim cannot be raised for the first time on appeal, where no objection is made, contemporaneous or otherwise, to a statement made in a closing argument. *State v. Hunter*, 22-0742 (La. App. 4 Cir. 7/6/23), 371 So. 3d 108, *writ denied*, 23-01091 (La. 2/27/24), 379 So. 3d 668.

In the state's closing argument, the prosecutor said that Ms. Howell saw Mr. Patton watching pornographic movies while P.P. and L.P. were present in the Southern Living trailer, rather than the living room of a prior home.

The record does not reflect that Mr. Patton's counsel made any objection, contemporaneous or otherwise, to the state's closing argument. As appeals are limited to objections made at trial, this court cannot consider an assignment of error raised for the first time

17

on appeal. Furthermore, a reviewing court "must be thoroughly convinced that the argument influenced the jury and contributed to the verdict before reversing a conviction based on misconduct during the closing arguments." *State v. Brazell*, 17-0032 (La. App. 4 Cir. 4/18/18), 245 So. 3d 15, 32.

We do not find that the comments made by the state in its closing argument affected the jury's verdict. Moreover, we find that the issue is moot since there was no contemporaneous objection made nor a request for a mistrial made at the time of the alleged misstatement by the state in its closing argument. Accordingly, we find that this assignment of error is without merit.

## CONCLUSION

For the reasons expressed, we affirm Mr. Patton's conviction and sentence.

**AFFIRMED.**

18